

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-17-2000

# Forbes v. Eagleson

Precedential or Non-Precedential:

Docket 99-1803

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Forbes v. Eagleson" (2000). *2000 Decisions.* Paper 222.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/222

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 17, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1803

DAVID S. FORBES; RICHARD D. MIDDLETON;
D. BRADFORD PARK; ULF NILSSON;
DOUGLAS D. SMAIL, suing individually and on behalf of
a class of similarly situated individuals, to wit, all persons
employed as professional hockey players by any of the
defendant professional hockey teams during the time
period in which defendant R. Alan Eagleson served as
Executive Director of the National Hockey League Players
Association

v.

R. ALAN EAGLESON; THE NATIONAL HOCKEY LEAGUE;
PHILADELPHIA FLYERS LIMITED PARTNERSHIP; BOSTON
PROFESSIONAL HOCKEY ASSOCIATION, INC.; NIAGARA
FRONTIER HOCKEY, L.P.; CALGARY FLAMES LIMITED
PARTNERSHIP; CHICAGO BLACKHAWK HOCKEY TEAM,
INC.; DALLAS HOCKEY CLUB, INC.; DETROIT RED
WINGS, INC.; EDMONTON OILERS HOCKEY CORP.; KTR
HOCKEY LIMITED PARTNERSHIP; LAK ACQUISITION
CORP.; LE CLUB DE HOCKEY CANADIEN, INC.;
MEADOWLANDERS, INC.; NEW YORK ISLANDERS
HOCKEY CLUB, L.P.; RANGERS HOCKEY CLUB, A
DIVISION OF MADISON SQUARE GARDEN CENTER,
INC.; PITTSBURGH HOCKEY ASSOCIATES; COMSAT
ENTERTAINMENT GROUP, INC.; a subsidiary of COMSAT
CORPORATION; ST. LOUIS BLUES HOCKEY CLUB, L.P.;
SAN JOSE SHARKS CORP.; MAPLE LEAF GARDENS,
LIMITED; VANCOUVER HOCKEY CLUB, LTD.;
WASHINGTON HOCKEY LIMITED PARTNERSHIP; JETS
HOCKEY VENTURES, (A LIMITED PARTNERSHIP); JOHN
ZIEGLER; WILLIAM W. WIRTZ; SAMUEL SIMPSON;

ARTHUR HARNETT; MARVIN GOLDBLATT; IRVING
UNGERMAN; HOWARD UNGERMAN; ARTHUR HARNETT
ENTERPRISES, LTD.; HARCOM CONSULTANTS, LTD.;
HARCOM STADIUM ADVERTISING; ALL CANADA SPORTS
PROMOTIONS, LTD.; RAE-CON CONSULTANTS, LTD.;
SPORTS MANAGEMENT, LTD.; EAGLETON, UNGERMAN,
a law firm; JIALSON HOLDINGS, LTD.; COLORADO
AVALANCHE LLC

David S. Forbes; Richard D. Middleton;
D. Bradford Park; Ulf Nilsson;
Douglas D. Smail,

      Appellants

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 95-07021)
District Judge: Honorable Thomas N. O'Neill, Jr.

Argued September 12, 2000

BEFORE: NYGAARD, ROTH, and GREENBERG,
Circuit Judges

(Filed: October 17, 2000)

      Martin J. Oberman (argued)
      36 S. Wabash Avenue, Suite 1310
      Chicago, IL 60603

      Alice W. Ballard
      Law Office of Alice W. Ballard, P.C.
      225 South 15th Street, Suite 1700
      Philadelphia, PA 19102

      Judson H. Miner
      Carolyn Shapiro
      Miner, Barnhill & Galland
      14 West Erie Street
      Chicago, IL 60610

Charles Barnhill, Jr.
Miner, Barnhill & Galland
33 East Miflin Street, Suite 803
Madison, WI 53703

Edward R. Garvey
Garvey & Stoddard
634 West Main Street
Madison, WI 53703

Arlin M. Adams
Nancy Winkelman
Schnader, Harrison, Segal & Lewis,
 L.L.P.
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

 Attorneys for Appellants

Michael A. Cardozo (argued)
Steven C. Krane
Tandy M. O'Donoghue
Proskauer Rose L.L.P.
1585 Broadway
New York, NY 10036

Bennett G. Picker
Ellen Rosen Rogoff
Stradley, Ronon, Stevens & Young,
 L.L.P.
2600 One Commerce Square
Philadelphia, PA 19103

Shepard Goldfein
Skadden, Arps, Slate, Meagher &
 Flom, L.L.P.
Four Times Square
New York, NY 10036

 Attorneys for Appellees
The National Hockey League;
Philadelphia Flyers Limited
Partnership; Boston Professional
Hockey Association, Inc.; Niagara
Frontier Hockey, L.P.; Calgary
Flames Limited Partnership;
Chicago Blackhawk Hockey Team,
Inc.; Dallas Hockey Club, Inc.;
Detroit Red Wings, Inc.; Edmonton
Oilers Hockey Corp.; KTR Hockey
Limited Partnership; LAK
Acquisition Corp.; Le Club De
Hockey Canadien, Inc.;
Meadowlanders, Inc.; New York
Islanders Hockey Club, L.P.;
Rangers Hockey Club, a division of
Madison Square Garden Center,
Inc.; Pittsburgh Hockey Associates;
Comsat Entertainment Group, Inc.,
a subsidiary of Comsat
Corporation; St. Louis Blues
Hockey Club, L.P.; San Jose
Sharks Corp.; Maple Leaf Gardens,
Limited; Vancouver Hockey Club,
Ltd.; Washington Hockey Limited
Partnership; Jets Hockey Ventures,
(A limited partnership); John
Ziegler, William W. Wirtz; Colorado
Avalanche L.L.C.

R. Alan Eagleson
Box 282
Clarkburg, Canada N0H1J0

 Attorney pro se

4

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. BACKGROUND

Five former National Hockey League ("NHL") players,
David S. Forbes, Richard D. Middleton, D. Bradford Park,
Ulf Nilsson, and Douglas D. Smail, have brought this RICO
class action on behalf of all individuals who played NHL
professional hockey during the time in which defendant R.
Alan Eagleson served as executive director of the National
Hockey League Players' Association ("NHLPA"). The
complaint, as amended, alleges that Eagleson committed a
variety of wrongful acts during his two-plus decades as
head of the NHLPA which led to his criminal prosecution
and conviction based on his pleas of guilty in both the
United States and Canada. Count I of the complaint alleges
that the NHL, its member teams, its president, John
Ziegler, and the chairman of its board of governors, William
Wirtz (collectively, the "NHL defendants"), conspired to bribe
Eagleson to sell out the players' interests in collective
bargaining. Count II of the complaint alleges that Eagleson
and certain companies with which he was affiliated
conspired to pilfer NHLPA funds over the course of many
years. The principal issue on this appeal is whether the
district court correctly granted Eagleson and the NHL
defendants summary judgment on Count I on statute of
limitations grounds. While Count II remains pending before
the district court, and thus is not at issue on appeal, we
nevertheless have jurisdiction under 28 U.S.C. S 1291, as
the district court properly certified its summary judgment
as final on Count I pursuant to Fed. R. Civ. P. 54(b).

The district court set forth the relevant background
relating to Count I in its published opinion:

> Defendant R. Alan Eagleson was executive director of
> the NHLPA, the exclusive bargaining unit of NHL
> players, from the union's inception in 1967 until the
> end of 1991. Essentially singlehandedly, he operated
> the union's daily business and conducted the players'

5

collective bargaining negotiations with the NHL. He also engaged in business for himself as an agent and lawyer representing players and even management personnel in their individual contract negotiations with club owners.

Plaintiffs allege that from 1976 through 1991 the NHL defendants gave Eagleson unsupervised control of a joint NHL-NHLPA venture which participated in international hockey tournaments. They also granted permission for NHL players to participate in the extra-NHL events, which would otherwise have been prohibited by the players' contracts. The participation of the best NHL players was essential to the success of the tournaments.

As head of the joint venture and as chief negotiator for the International Committee of Hockey Canada, a non-profit organization which negotiated international hockey events for Canada, Eagleson organized some two dozen or more tournaments from 1976 to 1991, including five Canada Cups and nearly annual World Championships and Soviet Union team exhibition tours. For each Canada Cup, Hockey Canada was to be paid the first $600,000 of net tournament proceeds after expenses and 15% of net revenues above $2 million. All other net revenues were to be split equally between the NHL clubs and the NHLPA. The NHL players earned little additional pay for playing in the tournaments and were induced to participate on the understanding that they would be benefitting their pension fund. In fact, plaintiffs allege, with Eagleson's assent the NHL defendants simply reduced their contributions to the pension fund by however much the players contributed through international hockey.

Eagleson allegedly used his control over international hockey to enrich himself and his associates. He (1) directed revenue from sales of television and rinkboard advertising rights to himself and associates; (2) appropriated air travel passes obtained from Air Canada in exchange for advertising rights for his personal use and that of family and associates; (3) charged excessive rents for office space; and (4)

6

obtained excessive reimbursement for the legal services of his law firm and for the services and expenses of employees of other of his private businesses who were `lent' to the international hockey venture to coordinate the tournaments. Many of these schemes reduced the net proceeds to be divided between the NHLPA and the NHL pursuant to their joint venture.

In addition, from 1977 to 1986 the NHL defendants gave Eagleson the power to place the NHL's disability insurance policies for the players. (He also controlled the NHLPA's insurance funds.) Eagleson allegedly used his control over the disability insurance funds to extort personal benefits from insurance brokers and sham legal fees from players seeking disability benefits.

The crux of plaintiffs' claim against the NHL defendants is that they knew that Eagleson was using his control of international hockey and NHL disability insurance funds to enrich himself, but nonetheless allowed him to continue to exercise these powers unconstrained. This acquiescence, plaintiffs allege, amounted to a pattern of violations of S 302 of the Labor-Management Relations Act (LMRA), 29 U.S.C. S 186. Violations of S 302 constitute predicate acts of racketeering under [RICO] 18 U.S.C. S 1961(1)(C) (defining as a `racketeering activity' any act indictable under 29 U.S.C. S 186).

Section 302 prohibits employers, employer associations, and their agents from paying money or any other `thing of value' to employee representatives, and prohibits employee representatives from accepting any such payment. 29 U.S.C. S 186(a), (b). Plaintiffs allege that the NHL defendants violated S 302(a) each time they permitted NHL players to participate in an international tournament, gave Eagleson unsupervised control over a tournament and its revenues, failed to hold Eagleson accountable for the revenues and/or overlooked his financial improprieties, and allowed him control over placement of the NHL's disability insurance premiums. Concomitantly, Eagleson allegedly violated S 302(b) every time he accepted control of an international tournament or the purchase

7

of disability insurance. Count I also alleges that Eagleson committed predicate acts of mail fraud and obstruction of justice in violation of 18 U.S.C.SS 1341, 1346, and 1512(b) in attempting to conceal his wrongdoing. See 18 U.S.C. S 1961(1). In addition, plaintiffs contend that Eagleson's predicate acts can be imputed to the NHL defendants and vice versa because they were co-conspirators.

In return for the NHL defendants' facilitation of and acquiescence in his self-enriching schemes, Eagleson allegedly betrayed the interests of the players in collective bargaining. Without attempting to gain concessions in return or marshal the players' collective leverage, he agreed to the 1979 merger of the NHL and World Hockey Association (WHA) [which allegedly caused player salaries to drop by eliminating competition from the WHA], lack of free agency, supplemental drafts, equalization rules, and non-disclosure of players' salaries; he acquiesced in the removal of player representatives from the board of the players' pension funds and in the owners' practice of offsetting pension contributions by the amount the players contributed via international hockey; and he agreed to inadequate minimum salaries. As a result, the players' compensation was substantially suppressed from what it would have been had they been represented by an un-compromised and aggressive union negotiator.

Eagleson negotiated collective bargains between the NHL and the NHLPA signed in 1976, 1981, 1984, and 1988. The last Eagleson-negotiated collective bargain expired in September 1991 and Eagleson's employment with the NHLPA terminated in December 1991.

Forbes v. Eagleson, 19 F. Supp.2d 352, 359-60 (E.D. Pa. 1998) (footnotes and citations omitted except that footnote 10 is in the quoted text).

Plaintiffs filed this action on November 7, 1995, and later amended their complaint several times. Eagleson and the NHL defendants moved to dismiss, or, in the alternative, for a summary judgment on the ground that the four-year

statute of limitations applicable to civil RICO claims barred Count I of the fourth amended complaint. The district court treated the motion as being for summary judgment and granted the motion in an opinion and order dated August 27, 1998. The court held that plaintiffs' claim with respect to injuries incurred before November 7, 1991 (four years prior to the filing of the action) was time-barred, and further held that plaintiffs failed to state a claim with respect to alleged "new and independent" injuries incurred on or after November 7, 1991. See id. at 378.

Relying on our then extant case law, the district court held that a civil RICO cause of action accrues for limitations purposes when a plaintiff "knew or should have known that the elements of a civil RICO cause of action existed." Id. at 357 (citation and internal quotation marks omitted). In the court's words, "plaintiffs' claims accrued and the statute of limitations began to run when they discovered or should have discovered that defendants had possibly engaged in conduct constituting the alleged pattern of racketeering and that this conduct had possibly caused them injury." Id. Within this formulation plaintiffs argued that they did not possess sufficient verifiable information to plead their Count I claim until 1994 when a federal grand jury indicted Eagleson for racketeering, embezzlement from a labor union, receipt of kickbacks affecting an employee welfare benefit plan, mail fraud, and obstruction of justice. Id. at 361. Defendants, by contrast, argued that plaintiffs had or should have had sufficient knowledge of the circumstances asserted in their Count I claim to bring this action by September 1991 at the latest, based on four sets of documents: (1) a 1984 Sports Illustrated article discussing allegations of wrongdoing by Eagleson; (2) a 1989 report on Eagleson's leadership of the union drafted by an attorney, Edward R. Garvey, on behalf of a large number of NHL players; (3) a June 1991 complaint brought by two NHL players before the Alberta Labour Relations Board alleging collusion between Eagleson and the owners during collective bargaining; and (4) a series of investigative articles about Eagleson published by The Eagle-Tribune of Lawrence, Massachusetts, in September 1991. Id. at 360-61. The district court, agreed with defendants, indicating as follows:

9

Even the most cursory of perusals of any one of these . . . publications would have revealed to plaintiffs the gist of their claim: Eagleson was enriching himself by means of international hockey and the disability insurance and the NHL defendants knew so but apparently took no action to remove those opportunities from him. Moreover, examination of either the Sports Illustrated or The Eagle-Tribune article[s] would have revealed almost every detail of the schemes plaintiffs now allege in their complaint, as well as sources to whom they could have gone for verification or further information. From them, plaintiffs learned or should have learned the following facts (as discussed below, plaintiffs contest in any significant way only their notice of the third fact listed below):

1. Eagleson controlled international hockey on behalf of the NHL-NHLPA joint venture and Hockey Canada. He controlled the organization, administration, expenses, and revenues of the tournaments.

2. Eagleson was indisputably benefitting him self and his associates from international hockey. For example, Eagleson admitted that he lent his employees to international hockey at higher rates than he paid them and pocketed the difference, and that he gave control of the sale of advertising rights to businesses headed by his close associate and client, Arthur Harnett.

3. Eagleson was possibly benefitting himself and his associates from international hockey in other ways he did not admit. For example, he might have controlled the Harnett companies to whom he gave tournament advertising rights and directly benefitted from their sales, and he might have subsidized his private businesses' office expenses by charging excessive amounts to international hockey just as he subsidized the salaries of his employees.

4. Eagleson's control over international hocke y and its finances was not possible without the assent of the NHL defendants, who agreed to permit their players to play in the tournaments and agreed to Eagleson's leadership of the NHL-NHLPA partnership.

10

5. The NHL defendants knew or should have know n, if only from the same public allegations of which plaintiffs were aware, of charges that Eagleson's control over international hockey was a conflict of interest and, more specifically, that Eagleson was enriching himself and his associates by means of international hockey. They nonetheless continued to permit their players to play in the tournaments and to allow Eagleson to run them without making any apparent move to police or otherwise constrain Eagleson's conduct.

6. Eagleson may have extorted personal benefits from brokers for placing disability insurance with them and may have charged players illegitimate fees for helping them get paid off on their union and NHL policies.

7. The NHL and Member Clubs allowed Eagleson t o place their insurance funds despite notice of charges that he had leveraged this power for his personal benefit.

These facts were more than sufficient to provide plaintiffs with notice that the NHL defendants might be turning a blind eye to Eagleson's use of international hockey and NHL disability insurance funds to enrich himself, and thus with notice of a claim that both the NHL defendants and Eagleson were continuously violating S 302 of LMRA. Indeed, on the basis of these facts plaintiffs could have actually [pled] almost every allegation in their complaint concerning defendants' alleged S 302 violations. That they may not have recognized that these facts added up to unlawful bribes is irrelevant.

Plaintiffs also knew or should have known of their alleged injuries. Each of the inadequacies in the Eagleson-negotiated collective bargaining agreements alleged in plaintiffs' complaint . . . [was] detailed in the Garvey report and most were also discussed in the Sports Illustrated and The Eagle-Tribune articles. Plaintiffs cannot seriously argue that players were unaware of their injuries as alleged in this action.

. . . .

11

To summarize, I find (1) it is undisputed and indisputable that plaintiffs had inquiry notice of their claim by 1990 at the latest; (2) in the exercise of reasonable diligence plaintiffs should at the very least have inquired into the specific factual allegations in the Garvey and Sports Illustrated reports; (3) these reports, as well as The Eagle-Tribune articles . . . provided notice to plaintiffs by October 1991 at the latest of more than sufficient facts to show the existence of their claim that the NHL defendants and Eagleson had engaged in a pattern of S 302 violations resulting in inadequate representation and bad deals for the players; and (4) no reasonable jury could find that plaintiffs were mislead as to their cause of action so as to toll the statute of limitations. Accordingly, I conclude that plaintiffs' claims [as] to injuries incurred prior to November 7, 1991 are barred as untimely.

Id. at 370-72, 377 (footnotes and citations omitted).

Following entry of the August 27, 1998 order, the district court granted plaintiffs leave to file a fifth amended complaint to plead a valid claim for new and independent injuries incurred after November 7, 1991. See Forbes v. Eagleson, No. CIV. A. 95-7021, 1999 WL 712571, at *1 (E.D. Pa. Sept. 10, 1999). After defendants moved for dismissal or summary judgment with respect to Count I of the fifth amended complaint, the district court granted summary judgment in their favor on September 10, 1999. See id. at *5. The district court then on October 14, 1999, entered its Rule 54(b) order following which plaintiffs appealed.

The questions presented on this appeal are (1) as we have indicated, whether the district court erred in holding that plaintiffs' Count I claim for injuries incurred prior to November 7, 1991, is time-barred, and (2) whether the district court erred in dismissing the Count I claim in the fifth amended complaint for injuries incurred after November 7, 1991. We, however, will not address the district court's order granting summary judgment on the claim for injuries incurred after November 7, 1991, as we are satisfied that the court reached the correct result on that disposition, including its limitation on discovery, and

12

that an opinion on the point would not have precedential value. Thus, we focus on the first question which requires us to determine when plaintiffs were on actual or constructive knowledge of their Count I claim. To that end, we review the four sets of documents upon which the district court relied in making its ruling on the timeliness issue as they are no less important to our result than they were to the result the district court reached.

The 1984 Sports Illustrated article

The July 1984 Sports Illustrated article made the following principal assertions regarding the conduct of Eagleson, the NHL and the NHLPA:

> 1. In his capacity as executive director of the NHLPA, Eagleson abused his positions as chief negotiator for Hockey Canada and as personal representative of many NHL players for his own gain and for the benefit of his friends.

> 2. Eagleson had numerous conflicts of interest in his capacities as executive director of the NHLPA, chief negotiator for Hockey Canada, and player representative.

> 3. Eagleson engaged in acts of self-dealing and assessed improper fees in connection with his administration of international hockey and player disability funds.

> 4. Eagleson may have failed properly to represent NHL players in collective bargaining between the NHL and the NHLPA as a result of his conflicts of interest.

> 5. Eagleson improperly diverted international hockey funds to his private businesses and may have used such funds improperly to cover his private business expenses.[1]

The 1989 Garvey report

The district court described the Garvey report and the events which precipitated it as follows:

---

1. The district court described and quoted the Sports Illustrated article at
great length. See Forbes, 19 F. Supp.2d at 361–62.

13

Beginning in late 1988, plaintiffs allege, agents of some hockey players began seeking information about the finances of international hockey tournaments. In November 1988, they `issued a "Position Paper" to the public in which, inter alia, they questioned Eagleson's conflicts as union leader and player agent as well as his role in international hockey,' contended that it was his fiduciary duty to disclose information on the tournaments' finances, and asserted that `[a]udited information should have been prepared regarding all monies received by Mr. Eagleson directly, or indirectly, in relation to his efforts in organizing the international hockey events.' About the same time, Ed Garvey, one of plaintiffs' counsel in this action, began an investigation of Eagleson and the union's affairs at the request of a `substantial number of members of the plaintiff class.' Garvey and other investigators unsuccessfully sought financial information about international hockey and the union from Eagleson, the union, the NHL, Hockey Canada, and the Canadian government.

Forbes, 19 F. Supp.2d at 363.

The Garvey report made numerous allegations regarding Eagleson. In addition to citing the 1984 Sports Illustrated article and recommending it for reading to all players, the Garvey Report cited instances of self-dealing and improper player representation against Eagleson. Moreover, it noted inadequacies in collective bargaining agreements and multiple bargaining concessions affecting NHL players attributable to Eagleson's compromised position. The report also criticized Eagleson for withholding information regarding international hockey, the NHL, the players' union and the pension fund, including information required to be disclosed by law.

Comments in the Garvey report indicated that its author suspected that Eagleson was selling out the players in exchange for the ability to draw profits from international tournaments. The report stated that "[t]he conflicts of interest [involving Eagleson] are shocking, but even more shocking is a pattern of sweetheart agreements with the NHL over all these years. It may sound harsh, but he has not pursued player interests at critical times in your history

14

as a union." App. at 109. The report stated as follows with regard to Eagleson's financial take from international hockey:

> The $25,000 Alan [Eagleson] received from the NHLPA [as a bonus for organizing international tournaments] may be the tip of the iceberg. We have asked Hockey Canada to tell us how much money goes to Alan, his law firm, holding companies he controls, family members or other legal entities. The result of our investigation is a big goose egg. The Hockey Canada spokesman, Ron Robinson told me: `We cannot tell you how much money went to Eagleson without Alan's permission, but he has the information if he wants to share it with you . . . .'

> . . . .

>  And, the man with the information, Alan Eagleson, won't give us an answer. While he has always maintained that he `doesn't take a dime from international hockey', former employees dispute that and now he admits that Hockey Canada pays some `overhead'. How much overhead? He won't say. Does he get money from promoting Intl. [sic] Hockey; from rink-board advertising as one player assured us he does?

App. at 118-19 (emphasis added). The report further stated:

> [Eagleson] is a different person when he negotiates for you against his friends Wirtz and Ziegler [as compared to when he negotiates his own contract with the NHLPA]. Our tiger becomes a pussycat. No research, no preparations, no surprise attacks, no strike threats, no goals. As one G.M. put it [as quoted in the Sports Illustrated article]: `Al delivers us the players and we give him international hockey. It's that simple.' A quid pro quo. It is no wonder the League put him in the Hockey Hall of Fame . . . .

> . . . .

>  . . . Harold Ballard called the 1982 collective bargaining agreement `a joke on the players'. Alan [Eagleson] wants to head international hockey. He can only do so if the NHL owners and Ziegler agree.

15

Therefore, he must not do things at the bargaining
table to antagonize them too much or they will dump
him--simple as that. Again, Trottier's agent commented
on Alan's conflict: `They can take international hockey
away from Alan so they have him where they want and
that isn't right.'

App. at 121-22, 155 (emphasis in original).2

The 1991 Alberta Labour Relations Board petition

In June 1991, agent Rich Winter--whose name is listed
along with Garvey's on the 1989 report--filed a petition
with the Alberta Labour Relations Board on behalf of two
NHL players seeking to void the 1988 CBA on the grounds
of collusion between Eagleson and the owners. See Forbes,
19 F. Supp.2d at 365. The petition alleged that there was
an "arrangement between the NHL and Eagleson pursuant
to which Eagleson delivers the players to the NHL under
the terms of a Collective Agreement more advantageous to
the NHL than it would have been had Eagleson negotiated
for the NHLPA in good faith in exchange for which the NHL
granted Eagleson the permission he needs to run
international hockey." App. at 608. The petition further
alleged as follows:

Eagleson, his family, and various firms or corporations
in which he or his family have an interest, had a
financial interest in the organization of each of
Canada's entries assembled by Eagleson for the World
Ice Hockey Championships and the Canada Cup
tournaments organized by Eagleson. Eagleson, his
family, and various firms or corporations in which he
or his family have an interest, received the following in
exchange for Eagleson's involvement in organizing
these events:

a. fees;

b. profits from the sale of television and other rights
for the events initially acquired by Eagleson, his
family, or said firms or corporations, at less than fair

_____

2. The district court described the Garvey Report at greath length. See
Forbes, 19 F. Supp.2d at 363-64.

16

market value through Eagleson's efforts in breach of Eagleson's fiduciary duties to the NHLPA;

c. free travel and accommodation vouchers;

d. indirect payments received from firms or corporations owned by Arthur Harnett, [insurance broker] Robert Bradshaw, or Harold Ballard but operated and controlled by Eagleson;

e. reimbursement of overhead expenses, some of which had previously been reimbursed by the NHLPA; and

f. payment or reimbursement of the salaries of individuals employed by Eagleson, his family or said firms or corporations for services other than services rendered in respect of the events from which Eagleson arranged for reimbursement.

The [petitioners] estimate the total profits received by Eagleson, his family or firms or corporations in which they have an interest, to be in the millions of dollars.

. . . .

To assure himself of the NHL's support for his assembling Canada's team at the World Ice Hockey Championships and the Canada Cups, Eagleson agreed with the NHL to use his influence to cause the NHLPA to negotiate for less than it could have achieved in collective bargaining conducted in good faith without such influence . . . .

App. at 611-12.

The petition eventually was dropped on the basis of an agreement of the parties. App. at 645.

The 1991 Eagle-Tribune articles

In September 1991, The Eagle-Tribune of Lawrence, Massachusetts, published a series of articles on the subject of "[i]ntrigue and conflict in the world of big-time hockey." App. at 646-78. These articles discussed the Sports Illustrated article, the Garvey report, and the Alberta Labour Relations Board petition and their contents. The

17

articles in The Eagle-Tribune, however, listed several "major findings," including the following:

> The head of the players' union, Eagleson, has repeatedly placed himself in a position of conflict of interest between players and team owners, and between union and personal business. Some players and other agents charge the players have wound up the losers. Meanwhile, they contend, Eagleson has won the favor of the league and team owners and advanced his own career, becoming perhaps the most powerful man in hockey.
>
> . . . .
>
> Eagleson became Canada's international hockey czar by obtaining the blessing of NHL owners, with whom he has bargained on behalf of the players. Eagleson also has close ties with NHL executives and some individual owners, but maintains he has been able to remain a tough negotiator for the players.
>
> . . . .
>
> Hockey players, who face the most restrictive free agent rules in North American professional sports, may have lost a major chance to win free agency when they consented to a 1979 merger between the NHL and the rival World Hockey Association (WHA). As a result, according to one study, hockey salaries have slumped in relation to salaries in the three other major sports.

App. at 646-47. Citing the Sports Illustrated article, The Eagle-Tribune indicated that, because Eagleson needed NHL approval to use NHL players in international tournaments, "[c]ritics say that makes Eagleson beholden to the same people he has bargained with on behalf of the players." App. at 655.

The 1994 indictment

In March 1994, a grand jury in the District of Massachusetts indicted Eagleson on 32 counts of racketeering, mail fraud, embezzlement of labor organization assets, witness tampering, and accepting kickbacks affecting an employee welfare benefit plan. App.

18

at 296. The indictment included specific allegations that, over a period of many years, Eagleson obtained improper personal profits from international tournaments and from his position of control over the players' disability insurance program. The indictment included the following allegations, among others:

> Eagleson stole profits from the sale of rinkboard advertising for various international tournaments-- profits which properly belonged to the NHLPA, the NHL, and Hockey Canada. These profits included air travel passes tendered by Air Canada as payment for rinkboard advertising space. Eagleson kept these passes for his personal use and for the use of his family and associates. Eagleson also provided Air Canada with tickets to Canada Cup games in return for air passes which he converted to his own use. The indictment also alleged that Eagleson transferred advertising rights for the 1991 Canada Cup tournament to a company, All Canada Sports Promotions, Ltd. which was controlled by one of Eagleson's business associates, Irving Ungerman, and that All Canada Sports Promotions, Ltd. resold the rights and paid Eagleson a portion of its profit. The indictment further charged that Eagleson's "interest in and involvement with rinkboard advertising sales at international hockey tournaments, and his arrangement with Air Canada, and income and value derived therefrom, was hidden and undisclosed to the members of the NHLPA," and it alleged that Eagleson made "false and fraudulent representations concerning his activities associated with the Canada Cup tournaments and other international hockey events." App. at 319.

> Eagleson received kickbacks from insurance brokers in exchange for placing the NHLPA's insurance business with those brokers. These kickbacks included cash payments and insurance for Eagleson and his family at little or no cost.

> Eagleson falsely represented to NHLPA members that neither he nor his family had received any money from international hockey events.

19

Eagleson, acting as chief negotiator for Hockey Canada, "paid unnecessary, inappropriate and excessive salaries and incurred other unnecessary and inappropriate expenses on behalf of Hockey Canada, including monies paid to members of Eagleson's family, business associates of Eagleson, and companies with which Eagleson was associated." App. at 314-15.

Eagleson "falsely represented to [NHLPA] members that . . . NHLPA expense records were properly kept, and that an `independent audit' of NHLPA records found no improper benefits or practices." App. at 331.

Eagleson made false representations to two injured players, Glen Sharpley and Bob Dailey, in the course of charging them improper fees for Eagleson's assistance in collecting on their disability claims. When members of the NHLPA raised concerns about Eagleson's behavior toward these two players, Eagleson falsely represented to NHLPA members that Sharpley's claim was a "difficult case" requiring the assistance of outside counsel. Eagleson did not disclose that Eagleson himself was the outside counsel whose assistance Sharpley paid for. App. at 346.

According to an affidavit from an Assistant U.S. Attorney, the indictment resulted from a "lengthy and comprehensive" investigation which produced information and evidence "much of which was not and is not publicly available." App. at 283-84.3

_____

3. Eagleson eventually pled guilty in January 1998 to an information alleging three counts of mail fraud. Count One alleged that Eagleson sent a letter to NHLPA members in 1989 falsely representing that neither he, nor his family or any company with which he was associated, ever had received any money directly or indirectly from international hockey events. Count Two alleged that Eagleson fraudulently converted NHLPA funds to his personal benefit by causing the NHLPA to incur expenses for clothing, theater tickets, and other goods and services. Eagleson sent a letter to NHLPA members in 1989 falsely representing that no such improper expenditures had occurred. Count Three alleged mail fraud based on a 1989 letter from Eagleson to members of the NHLPA which made false representations regarding Eagleson's involvement in the handling of Glen Sharpley's disability claim. App. at 183-96, 370-75.

20

II. DISCUSSION

A. Accrual of Plaintiffs' Claim

The first question we address is when plaintiffs' Count I claim accrued. While RICO does not include a limitations period for civil claims, the Supreme Court held in Agency Holding Corp. v. Malley-Duff Assocs., 483 U.S. 143, 156, 107 S.Ct. 2759, 2767 (1987), that the four-year limitations period in civil antitrust actions seeking treble damages under the Clayton Act is applicable to RICO actions. 4 See also Klehr v. A.O. Smith Corp., 521 U.S. 179, 183, 117 S.Ct. 1984, 1987 (1997). That conclusion, however, did not establish when a RICO claim accrues, i.e., when the four-year term starts running. Following the Supreme Court's decision in Malley-Duff, we established our accrual rule in Keystone Insurance Co. v. Houghton, 863 F.2d 1125 (3d Cir. 1988), as follows:

> The rule which we announce provides that the limitations period for a civil RICO claim runs from the date the plaintiff knew or should have known that the elements of a civil RICO cause of action existed, unless, as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur which are part of the same pattern. In that case, the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same `pattern.'

Id. at 1126.

However, due to two Supreme Court opinions, the rule governing the accrual of civil RICO claims has changed several times in recent years and thus Keystone does not remain the law. First, in Klehr the Court specifically rejected the "last predicate act" portion of our rule in Keystone on the ground that it "creates a limitations period that is longer than Congress could have contemplated." See

_____

4. We are exercising plenary review on this appeal. See Nelson v. Upsala College, 51 F.3d 383, 385 (3d Cir. 1995).

521 U.S. at 187, 117 S.Ct. at 1989. The Court noted that other courts of appeals had adopted one of two accrual rules for RICO claims: (1) an "injury and pattern discovery" rule, under which a RICO claim accrues when the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern of racketeering activity, and (2) an "injury discovery" rule, under which a RICO claim accrues when the plaintiff simply discovers or should have discovered his injury. See id. at 185, 117 S.Ct. at 1988–89; Annulli v. Panikkar, 200 F.3d 189, 195 (3d Cir. 1999). The Court declined to resolve this conflict, however, choosing instead to leave the matter for another day as the statute of limitations barred the action before it under either formulation. See id. at 191–93, 117 S.Ct. at 1991–92.

In the wake of Klehr, we chose to follow the"injury and pattern discovery" rule; in effect, we adhered to the Keystone rule minus the "last predicate act" exception which the Supreme Court had rejected in Klehr . See Annulli, 200 F.3d at 192, 195; see also Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 656 (3d Cir. 1998). Thus, under Annulli, "a civil RICO claim accrues and the statute of limitations begins to run when the plaintiff knew or should have known that each element of a civil RICO claim existed--namely, that he was injured, that the defendant was the source of this injury, and that a pattern of activity prohibited by RICO caused this harm." Annulli, 200 F.3d at 195. The district court applied the"injury and pattern discovery" rule in this case. See Forbes, 19 F. Supp.2d at 356–57.

Earlier this year, however, the Supreme Court rejected the "injury and pattern discovery" rule. See Rotella v. Wood, 120 S.Ct. 1075, 1078–80 (2000). In its place, the Court contemplated that it eventually would adopt one of two accrual rules: (1) an injury discovery rule, or (2) an "injury occurrence rule" under which knowledge of injury would be irrelevant. The Court, however, again left the matter unsettled, as it decided that at that time it would not choose between the rules. See id. at 1080 n.2.

Thus, once again we must make a decision regarding when a RICO action accrues even though we are aware that

22

the Supreme Court ultimately may accept or reject our choice. After careful consideration, we will adopt an injury discovery rule rather than an injury occurrence rule. We do so for what seems to us to be the sound reason that the injury discovery rule is in harmony with the general notion that a discovery rule applies whenever a federal statute of limitation is silent on the issue.5 Under the injury discovery rule, we must determine when the plaintiffs knew or should have known of their injury. Thus, we alter the judicial landscape unfavorably to the plaintiffs from the shape in which it existed when this case was before the district court and consider the case under an accrual rule more adverse to plaintiffs than that the district court applied.

We, of course, start with the complaint. Count I of plaintiffs' fourth amended complaint describes the alleged injury as follows:

> 64. The object and purpose of the racketeering act ivity . . . was to cause Eagleson . . . and the NHLPA to come under the influence and control of the NHL, the Member Clubs, Ziegler, and Wirtz, and to fail to aggressively represent the interests of the NHLPA players by granting unreasonable concessions to and failing to seek benefits from the NHL and the Member Clubs during the period from the mid-1970's through at least the end of 1991 . . . . The further object and purpose was to enable the Member Clubs to pay far less in compensation to the NHLPA players then they would otherwise have paid, thereby unjustly enriching themselves at the players' expense.

> . . . .

> 72. As a direct and proximate result of the conduc t of defendants described above, the plaintiffs and each member of the plaintiff class have been injured in their business or property, as provided, in 18 U.S.C. S 1964(c), including, but not limited to, losses of hundreds of thousands of dollars, each, in salary and other benefits which they would have earned as

---

5. The parties do not dispute that Rotella applies retroactively to this case.

23

> employees of the Member Clubs but for the illegal
> activity set forth above.

App. at 67-68.

On the record before us, it is clear as a matter of law that plaintiffs were aware, or should have been aware, of the injuries they alleged at least as early as 1989. The Garvey report, issued to NHLPA members that year, argued extensively that NHL players were receiving reduced salary and benefits as a result of Eagleson's failure to engage in vigorous collective bargaining. The report stated that "[n]o benefits of any significance have been achieved in the entire decade of the 80's through collective bargaining" and charged that "the [NHLPA] has gone backward while sports unions in all other sports have made major gains." The report presented statistics to show that NHL players are "last [in professional sports] in salaries, benefits, percentage of gross, and in information." App. at 106. The report argued that Eagleson's failure to bargain vigorously against the NHL owners was the reason for the players' poor situation:

> Frankly, if any other union leader did what Alan
> Eagleson has done over the past 22 years, the news
> media would be screaming for an investigation. The
> conflicts of interest are shocking, but even more
> shocking is a pattern of sweetheart agreements with
> the NHL over all these years. It may sound harsh, but
> he has not pursued player interests at critical times in
> your history as a union. There is a legitimate question
> whether there is, in fact, a `players' association. For the
> most part, it seems that Alan runs the Association as
> his private preserve . . . .
>
> . . . .
>
>  Last on the list [of professional sports with respect to
> such matters as free agency, impartial arbitration, and
> players' percentage of gross revenues] is the NHL. Last
> because the Players Association under Alan Eagleson
> has never been prepared for bargaining. We don't know
> how tough the NHL is at the bargaining table because
> they have never been tested. Never a serious law suit
> filed against the league to obtain free agency, and,

24

> when they had it handed to them on a plate with the proposed WHA-NHL merger, Eagleson gave away player freedom without a whimper.
>
> . . . .
>
> Alan Eagleson is a brilliant attorney and politician. He admits that John Ziegler is one of his best friends and Bill Wirtz, who lives near him in Florida, is an extremely close friend despite the fact that Wirtz is the chief negotiator for the NHL. Given his brilliance, there is really no excuse for the lack of preparation for bargaining except one--he does not take bargaining seriously because he is comfortable with the cozy relationship that has been so good for him . . . .
>
> . . . .
>
> Alan Eagleson has been a vital part of the NHL establishment. He has contributed greatly [through his failure to bargain aggressively with the owners] to keeping salaries down, profits up. He has helped maintain [the NHL's] monopoly status, he keeps players tied up [by failing to bargain for free agency], he allows the League to control through non-impartial arbitration; he eliminates freedom whenever it raises its ugly head; and he keeps you in the dark on the economics of the League while singing management's song about the `fragile' NHL.

App. at 109, 110, 112, 145 (emphases in original).

We have no doubt that by 1989 (and probably earlier), NHL players were aware that they did not enjoy similar salaries, free agency rights, or other advantages available to players in other professional sports. Furthermore, we do not understand how anyone who has considered the Garvey report--which was commissioned at the behest of some 200 NHL players--can doubt that it should have led the players to believe that their situation was largely a result of the "cozy" collective bargaining relationship between Eagleson on the one hand and Ziegler, Wirtz, and the owners on the other. Thus, by 1989 at the latest, plaintiffs were aware, or should have been aware, of the injury which they allege in Count I (reduced salary and benefits) and the source of the

25

injury (the improper bargaining behavior by Eagleson). Under an injury discovery rule, nothing more was required to trigger the running of the four-year limitations period. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386 (3d Cir. 1994) (limitations period commences when "plaintiff has discovered or, by exercising reasonable diligence, should have discovered (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct"; "We have in the past stated that a claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong").6

Indeed, possibly aware that clearly their Count I claim accrued prior to November 7, 1991, the plaintiffs argue that --regardless of their awareness of the alleged injury--the statute of limitations was tolled until 1994 (when Eagleson was indicted) because defendants' acts of fraudulent concealment prevented them from learning facts essential to pleading the predicate acts of bribery underlying their Count I claim. Thus, we now turn to the issue of fraudulent concealment.

B. Fraudulent Concealment

In Rotella, the Supreme Court stated that,"[i]n rejecting pattern discovery as a basic rule, we do not unsettle the understanding that federal statutes of limitations are generally subject to equitable principles of tolling, and where a pattern remains obscure in the face of a plaintiff 's diligence in seeking to identify it, equitable tolling may be

_____

6. Plaintiffs contend that the district court made errors with respect to its allocation of the burden of proof. If we were reviewing a judgment entered by the district court predicated on findings made at a nonjury trial we would be obliged to consider these contentions but inasmuch as we are exercising plenary review of a summary judgment, we have no need to make an analysis of the district court's allocation of the burden of proof. After all, we are applying the law ourselves to the historical facts and, even though we reach the same result as did the district court, we make our determinations on the basis of the law as we find it to be for the reasons we have set forth. Thus, it does not matter whether the district court erred with respect to placing the burden of proof as we do not defer to its decision.

26

one answer to the plaintiff 's difficulty . . .." Rotella, 120 S.Ct. at 1084 (citation omitted). Unlike the discovery rule, which determines the time of the initial commencement of a limitations period, "[e]quitable tolling functions to stop the statute of limitations from running where the claim's accrual date has already passed." Oshiver, 38 F.3d at 1387. Among the circumstances warranting equitable tolling are situations where "the defendant has actively misled the plaintiff respecting the plaintiff 's cause of action," i.e. fraudulent concealment. Id. at 1387. "[W]here the plaintiff has been actively misled . . . the equitable tolling doctrine provides the plaintiff with the full statutory limitations period, starting from the date the facts supporting the plaintiff 's cause of action either become apparent to the plaintiff or should have become apparent to a person in the plaintiff 's position with a reasonably prudent regard for his or her rights." Id. at 1389. We have described the differences between the discovery rule inquiry and the equitable tolling inquiry as follows:

> [T]he discovery rule and the equitable tolling doctrine are similar in one respect and different in another. The doctrines are similar in that each requires a level of diligence on the part of the plaintiff; that is, each requires the plaintiff to take reasonable measures to uncover the existence of injury. The plaintiff who fails to exercise this reasonable diligence may lose the benefit of either doctrine. The two doctrines differ, however, with respect to the type of knowledge or cognizance that triggers their respective applications. The discovery rule keys on a plaintiff 's cognizance, or imputed cognizance, of actual injury. Equitable tolling, on the other hand, keys on a plaintiff 's cognizance, or imputed cognizance, of the facts supporting the plaintiff 's cause of action. Underlying this difference between the discovery rule and equitable tolling is the more fundamental difference in purpose between the two rules. The purpose of the discovery rule is to determine the accrual date of a claim, for ultimate purposes of determining, as a legal matter, when the statute of limitations begins to run. Equitable tolling . . . presumes claim accrual. Equitable tolling steps in

27

> to toll, or stop, the running of the statute of limitations in light of established equitable considerations.

Id. at 1390 (emphasis added) (citations and footnotes omitted).

We have indicated that the plaintiff has the burden of proving fraudulent concealment. See In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1179 (3d Cir. 1993). The plaintiff must show active misleading by the defendant, see Oshiver, 38 F.3d at 1391 n.10, and must further show that he exercised reasonable diligence in attempting to uncover the relevant facts. See id. at 1390; see also Klehr, 521 U.S. at 194, 117 S.Ct. at 1993 (in the civil RICO context, " `reasonable diligence' does matter, and a plaintiff who is not reasonably diligent may not assert `fraudulent concealment.' "). Further, the plaintiff must show that he actually was "mis[led] . . . into thinking that he d[id] not have a cause of action," Davis v. Grusemeyer, 996 F.2d 617, 624 (3d Cir. 1993); in other words, the tolling lasts only "until the plaintiff knows, or should reasonably be expected to know, the concealed facts supporting the cause of action . . . ." Oshiver, 38 F.3d at 1392. Thus, ordinarily when plaintiffs seek to demonstrate a case for equitable tolling, and defendants seek summary judgment on the issue, a court must determine (1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their Count I claim, (2) whether there is sufficient evidence to support a finding that plaintiffs exercised reasonable diligence, and (3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint. Absent evidence to support these findings there is no genuine dispute of material fact on the issue and the defendants are entitled to summary judgment. See Northview Motors, Inc. v. Chrysler Motors Corp., No. 99-3873, ___ F.3d ___, 2000 WL 1273953, at *8 (3d Cir. Sept. 8, 2000).

28

We will assume without deciding that the defendants, particularly Eagleson, engaged in affirmative acts of concealment designed to mislead plaintiffs about a fact supporting their Count I claim--namely, the fact that Eagleson was profiting personally from his control over the international tournaments and the disability insurance program. We also will assume without deciding that the plaintiffs exercised reasonable diligence in an attempt to uncover the relevant facts. Nevertheless, we will affirm the order for summary judgment as the plaintiffs either knew or reasonably should have known the facts supporting their course of action well prior to four years before they brought this case on November 7, 1995.

As the NHL defendants correctly indicate, the allegations in the Complaint against them appeared in the 1984 Sports Illustrated article and 1989 Garvey Report, and a virtual carbon copy of the complaint was filed with the Alberta Labour Relations Board before the limitations period expired. See app. at 601-44. Thus, the plaintiffs knew of sufficient facts to support their claim at least 6 years before they filed this case. In particular, they certainly knew of Eagleson's poor representation of them and that, with the cooperation of the NHL defendants, he was profiting from international hockey through use of the players' labors. Although it is true that Eagleson denied wrongdoing, nonetheless, his denials do not allow plaintiffs, who were aware of their potential claim, to allege ignorance. Moreover, inasmuch as civil RICO actions tend to arise in business situations in which the defendants will deny wrongdoing, an expansive application of tolling rules will create a limitations period beyond what Congress contemplated. See Klehr, 521 U.S. at 187, 117 S.Ct. at 1989.

We also point out that while the Supreme Court in Rotella indicated that "where a pattern remains obscure in the face of a plaintiff 's diligence in seeking to identify it, equitable tolling may be . . ." applicable, Rotella, 120 S.Ct. at 1084, there was nothing obscure about the actionable conduct here. The Garvey report said the "conflicts of interest are shocking" and "even more shocking is a pattern of sweetheart agreements." App. at 109. Furthermore, it

29

had been evident for many years that Eagleson used his position for personal illegitimate gain.

We recognize that plaintiffs insist they lacked sufficient information until Forbes was indicted to plead their RICO claim consistently with Fed. R. Civ. P. 11 and, indeed, support this contention with their affidavits. But we are satisfied that plaintiffs' statements on this point do not create a genuine dispute of fact precluding the district court from granting summary judgment on the tolling issue as the unmistakable historical facts demonstrate that the plaintiffs were aware or should have been aware of the facts supporting their Count I claim long before November 7, 1991. Thus, contrary to plaintiffs' position, we have no doubt that they and their attorneys could have signed a federal complaint consistently with Rule 11 prior to November 7, 1991.7 As the district court noted, plaintiffs "could have actually pled almost every allegation in their complaint concerning defendants alleged S 302 violations" based on the facts contained in the various publications available to them. Forbes, 19 F.3d at 372. Furthermore, the Garvey report which was available to them long before November 7, 1991, gave the plaintiffs an additional basis for the action.

Although Rule 11 imposes a duty of reasonable inquiry as to the facts set forth in a pleading, Dura Systems, Inc. v. Rothbury Investments, Ltd., 886 F.2d 551, 556 (3d Cir. 1989), "[i]t is not necessary that an investigation into the facts be carried to the point of absolute certainty." Kraemer v. Grant County, 892 F.2d 686, 689 (7th Cir. 1990). We so held in Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir. 1988) (citations omitted), in which we overturned an award of sanctions under Rule 11 indicating,

> At the time plaintiffs' counsel filed the [antitrust] complaint here, he knew facts that supported a

_____

7. Plaintiffs seem to contend that prior to its amendment in 1993 Rule 11 placed a more stringent burden on a person signing a pleading than it did following the amendment and that we should consider the effect of Rule 11 as it existed prior to the amendment. We are satisfied, however, that Rule 11, either before or after 1993, was not an impediment to plaintiffs bringing this action long before they did so.

> reasonable suspicion of cooperation between
> defendants and other parties who could have been
> expected to benefit from the defendants' intransigence.
> These factual circumstances and the rational
> inferences that may be drawn from them convince us
> that the allegations of the first count comported with
> Rule 11's pre-filing investigation requirement.

See also Morda v. Klein, 865 F.2d 782, 785-86 (6th Cir. 1989) ("It would be particularly difficult to fault plaintiffs for a lack of prefiling inquiry when, as here, defendants have refused plaintiffs access to material information that would bear on certain allegations made in the complaint."). In this regard we point out that "[a] signer's obligation personally to comply with the requirements of Rule 11 clearly does not preclude the signer from any reliance on information from other persons." Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1278 (3d Cir. 1994). It is inconceivable to us that if plaintiffs had brought this action in a timely fashion and had been unsuccessful that a court would have found that the imposition of Rule 11 sanctions against them for having filed the complaint would have been appropriate.8

Finally, we are not impressed with the plaintiffs' argument that they were justified in delaying bringing their action as the government, notwithstanding its resources, did not obtain an indictment until 1994 after it completed its investigation. After all, even though RICO is a criminal statute, surely civil RICO cases are brought in situations in which it is hardly conceivable that there could be a criminal indictment. See Tabas v. Tabas, 47 F.3d 1280, 1302, 1310 (3d Cir. 1995) (en banc) (Greenberg, J., dissenting). Thus, the mere fact that the government did not obtain an indictment before a time within plaintiffs' four-year statute

_____

8. We are not holding that merely because plaintiffs could have filed their
complaint long before they did without violating Rule 11, that their failure to do so precludes tolling on a fraudulent concealment basis. Rather, we simply are holding that Rule 11 does not save plaintiffs' claim in the circumstances of this case. We do not determine whether there is a class of claims in which the statute of limitations is tolled even though
the potential plaintiffs could have filed a complaint during the tolling period without violating Rule 11.

of limitations period does not mean that the statute of limitations in this case should be deemed equitably tolled until the return of the indictment.

III. CONCLUSION

For the foregoing reasons the orders for summary judgment entered August 27, 1998, and September 10, 1999, as made final by order entered October 14, 1999, will be affirmed.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

32