Edward E. GATZ, and Donald D. Graham, individually and on behalf of those similarly situated, and Edward E. Gatz and Donald D. Graham, derivatively on behalf of Regency Affiliates, Inc. Plaintiffs,

v.

William R. PONSOLDT, Sr., Statesman Group, Inc., William R. Ponsoldt, Jr., Marc H. Baldinger, Stephanie Carey, Martin J. Craffey, Royalty Holdings LLC, Royalty Management Inc., Laurence Levy, and Regency Affiliates Inc., Defendants.

No. CIV.03–828–SLR.

United States District Court, D. Delaware.

Dec. 18, 2003.

---

6. *See Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 353 (S.D.N.Y.1998).

**720**

Alan J. Stone, R. Judson Scaggs, Jr., James G. McMillian, III, and Jerry C. Harris, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Blackwell Sanders Peper Martin, Omaha, Nebraska (Thomas H. Dahlk, Michael S. Degan, Trenten P. Bausch, of counsel), for plaintiffs.

John L. Reed, Daniel V. Folt, Gary W. Lipkin, and Matt Neiderman, of Duane Morris LLP, Wilmington, DE, for Defendants William R. Ponsoldt, Sr., William R. Ponsoldt, Jr., Marc H. Baldinger, Stephanie Carey and Martin J. Craffey.

Gregory P. Williams, Peter B. Ladig, and Steven L. Brinker, of Richards, Layton & Finger, P.A., Wilmington, DE, for Defendants Royalty Holdins, L.L.C., Royalty Management, Inc., and Laurence Levy.

Kevin R. Shannon, and Brian C. Ralston, of Potter Anderson & Corroon LLP, Wilmington, for Defendant Statesman Group, Inc.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

### I. INTRODUCTION

This is a class and derivative action brought by Edward E. Gatz and Donald D. Graham who are stockholders in Regency Affiliates, Inc. ("Regency"), alleging both direct and derivative injury claims. (D.I. 157) The defendants in this action are William R. Ponsoldt, Sr. ("Ponsoldt Sr."), William R. Ponsoldt, Jr. ("Ponsoldt Jr."), Marc H. Baldinger, Stephanie Carey and Martin J. Craffey (collectively, the "Former Regency Directors"); Laurence Levy, Royalty Holdings, LLC, Royalty Management, Inc. (collectively "Royalty"); Statesman Group, Inc. ("Statesman"); and Regency. In plaintiffs' amended complaint, they allege eight claims, including three under 18 U.S.C. § 1962, and the remainder under state law. (D.I.157) The court's jurisdiction over these claims is based upon 28 U.S.C. § 1331 for the federal claims, and upon 28 U.S.C. § 1967(a) for the state law claims.

Pending before the court are the following motions of the parties: (1) motion by Former Regency Directors to dismiss the

amended complaint (D.I.296); (2) motion by Statesman to dismiss the amended complaint (D.I.299); (3) motion by plaintiffs for leave to file a supplemental and second amended complaint (D.I.302); (4) motion by plaintiffs for an order maintaining the status quo (D.I.305–1); (5) motion by plaintiffs for a preliminary injunction (D.I. 305–2); (6) motion by Royalty to dismiss the amended complaint (D.I.321); and (7) motion by Regency to dismiss the amended complaint (D.I.324). Because the court concludes that plaintiffs' federal claims are barred by operation of 18 U.S.C. § 1964(c), the court will grant defendants' motions to dismiss those claims and, on its own motion, will dismiss the remainder of the complaint for lack of subject matter jurisdiction.

## II. BACKGROUND

### A. The Parties

Recency is a publicly traded corporation organized and existing under the laws of Delaware. First organized under the name of Transcontinental Energy Corporation, it is a successor in interest to Transcontinental Oil Corporation. (D.I. 157) Plaintiffs' derivative claims are brought on behalf of Regency.

Plaintiffs Gatz and Graham are the owners of 61,370 and 1,064 respective shares of Regency common stock. (*Id.*) Graham served as a Regency director between August 1999 and December 2000. (D.I. 157, ¶ 44; D.I. 325, ex. B, ¶ 8)

Ponsoldt Sr. is a former Chairman of the Board of Regency, former Chief Executive Officer ("CEO"), former President of Regency, and a stockholder. (*Id.*) Ponsoldt Sr. joined the Board of Directors in June 1996.

Ponsoldt Jr. is the adult son of Ponsoldt Sr., and was appointed to the Regency Board of Directors in July 1993, serving until October 28, 2002. At the time of his appointment, Ponsoldt Jr. received options to purchase shares of Regency's Series C Preferred Stock ("Series C Preferred"). (*Id.*)

Baldinger was elected to the Board of Directors at an August 1999 stockholder meeting, a position he held until October 28, 2002. Since 2001, Baldinger has served as Chief Financial Officer for Regency. (*Id.*)

Carey served as a director of Regency from July 1993 until October 28, 2002. Carey received 100,000 shares of Regency common stock from Statesman at the time of her appointment. (*Id.*)

Craffey was appointed to the Regency Board of Directors in July 1993 and served until October 16, 2002. Craffey received options to purchase shares of Regency Series C Preferred from Statesman at the time of his appointment in 1993. (*Id.*)

Statesman is a Bahamaian corporation with its principal place of business in Nassau, the Bahamas. Statesman was formed for the purpose of investing on behalf of the Statesman Trust, an irrevocable trust settled by Ponsoldt Sr. in the Bahamas for the benefit of its beneficiaries, Ponsoldt Sr.'s children. Until October 16, 2002, Statesman held 38.9% of the outstanding shares of common stock, and 50% of the outstanding shares of Series C Preferred. Statesman is alleged to be dominated and controlled by Ponsoldt Sr. (*Id.*)

Royalty Holdings LLC is a limited liability company organized and existing under the laws of Delaware. Royalty Management, Inc. is a corporation organized and existing under the laws of Delaware, and is the managing member of Royalty Holdings. (*Id.*)

Laurence Levy is the President, sole director, and sole stockholder of Royalty Management. He succeeded Ponsoldt Sr.

as President and CEO of Regency, following Regency's 2002 recapitalization.

### B. Regency Transactions

In late 1984, Regency, its wholly-owned subsidiaries, and twenty-one affiliated limited partnerships filed for bankruptcy protection and reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978. (*Id.*) In late 1988, the operating results of two Regency subsidiaries were poor, including Willbanks Steel Corporation ("Willbanks"); a second Chapter 11 reorganization was filed for Willbanks. On April 15, 1992, Regency turned over its stock investment in Willbanks to the bankruptcy trustee and reached a settlement agreement with all senior lenders, resulting in the issuance of its Series B Preferred Sock. As of 1992, the only substantial asset held by Regency was considerable net operating loss carryforwards ("NOLs"). At that time, the only remaining subsidiary of Regency was Transcontinental Drilling Company ("Drilling"). (D.I.298, ex. D)

According to its December 1992 10–k filing with the Securities and Exchange Commission ("SEC"), Regency's sole director and executive officer was L.J. Horbach, who served from 1987 to 1990 as a director, and from 1992 until 1993 as director. (D.I.298, ex. D) Horbach specialized in corporate restructuring. Horbach sought to obtain investors which could benefit from Regency's sole substantial asset, the NOLs. (*Id.*)

### 1. The Aggregate Transactions

In an agreement dated December 12, 1992 between Regency and Sunriku International Investments, Ltd. ("Sunriku"), a Statesmen/Ponsoldt Sr. affiliate, provision was made for Regency to acquire eighty percent (80%) of the outstanding stock in National Resource Development Corporation (Delaware) ("NRDC–Delaware") in exchange for securities of Regency and its subsidiary (the "1992 Aggregate transaction"). At the time, NRDC–Delaware was a wholly-owned subsidiary of International Aggregate Company, another Statesman/Ponsoldt Sr. affiliate. NRDC–Delaware's sole asset was approximately seventy-five million short tons of previously quarried and piled aggregate rock located in Iron Mountain, Michigan ("Aggregate"), valued at $15 million. (D.I.157, ¶¶ 14–15)

On June 4, 1993, Regency entered into an agreement to acquire eighty percent (80%) of the common stock of NRDC–Delaware from Statesman (the "1993 Aggregate transaction"). Ponsoldt Sr. is alleged to have taken an active role in this NRDC–Delaware transaction. (*Id.*, ¶ 16)

On June 29, 1993, NRDC–Delaware was reincorporated under the laws of the State of Nevada ("NRDC") by Statesman and acquired title to Aggregate. On July 7, 1993, 2,975,000 shares of Regency's common stock, 208,850 shares of Regency's Series C Preferred, and twenty percent (20%) of the outstanding shares of Drilling were transferred to Statesman or persons and entities designated by Statesman. As of July 7, 1993, Statesman owned 28.78% of the common shares of Regency and all of Regency's Series C Preferred.[1] (*Id.*, ¶ 17)

On July 7, 1993, Statesman designated eight persons to fill existing vacancies on

---

1. The terms of the Series C Preferred provide that Regency may redeem the shares of Series C Preferred at a price equal to the lessor of: (1) $20,885,000; or (2) the fair market value of the common stock of NRDC acquired by Regency (the "Redemption Price"). The holders of Series C Preferred are also entitled to a liquidation preference equal to the lessor of: (1) the net proceeds of the Aggregate or (2) the Redemption Price (the "Liquidation Value").

the Regency Board of Directors, including: Carey, Ponsoldt Jr., Craffey, and Pamlyn Kelly each of whom received shares of Regency common stock and/or options to purchase shares of Series C Preferred from Statesman. (D.I. 298, ex. E. at 53–54)

Statesman, in addition to the 28.78% of the common stock it owned, also held irrevocable proxies for an additional 855,991 shares of Regency's common stock. As a consequence, Statesman was entitled to vote approximately thirty-four percent (34%) of the outstanding shares of Regency as of December 31, 1993.[2]

Between July 1993 and December 2001, only casual and insignificant sales of the Aggregate were made. In December 2001, the Aggregate was sold to Iron Mountains Resources, Inc., a subsidiary in which Regency held seventy-five percent (75%) of the shares. The purchase price for the Aggregate was $18,200,000, for which a promissory note was tendered payable with interest at 2.46% in 96 equal payments of principal and interest commencing December 2003. (D.I.157, ¶ 21)

Plaintiffs allege that the 2001 sale of the Aggregate will be used by the defendants to increase the Redemption Price and Liquidation Preference of the Series C Preferred.

## 2. Acquisition of Security Land

In late 1994, Regency made an equity investment in a partnership interest in Security Land & Development Company Limited Partnership, a Delaware limited partnership ("Security Land"). Security Land owns an office building with 717,011 net usable square feet presently occupied by the Social Security Administration

("SSA"). The building is adjacent and connected with the SSA's headquarter campus located at 1500 Woodlawn Drive, Woodlawn, Maryland. In 2002, the office building is alleged to have a value of approximately $170 million. (*Id.*, ¶ 22)

The Security Land investment involved the efforts of two past Regency CEO's, Gay Spahn and Gary Nuttal, and its former director Horbach. In exchange for a capital contribution of $300,000 and NOLs in excess of $60 million, Regency received ninety-five percent (95%) of the profits, losses, and cash flow of Security Land (substantially all of which cash flow is committed to amortize the principal balance on the property's mortgage) through October 31, 2003, and fifty percent (50%) thereafter; approximately fifty percent (50%) of the partnership interest; the right to receive, upon sale or refinancing of the Security Land property, the proceeds in accordance with the partners' positive capital account balances; the right to be engaged by Security Land as a consultant to advise on financing of the building at an annual management fee equal to the federal and state tax obligations of Regency, capped at $100,000 annually through 2003, paid from Regency's participation in cash flow; and an express limitation on any obligation by Regency to contribute additional capital. (*Id.*, ¶ 23–25)

## 3. Ponsoldt Sr.'s Compensation

On August 26, 1996, Ponsoldt Sr. was elected chairman of the board of Regency. Nuttall was terminated as President and CEO, and Kelly, who had been serving as a director since July 1993, was appointed as acting CEO. After conducting a search for a new president, the Regency board

---

2. Presumably, this approximate one third ownership interest, and its 1993 appointment of directors to vacant positions on the Regen-

cy board, is the basis for plaintiffs' claim that Statesman is a controlling stockholder.

decided to hire Ponsoldt Sr. as president and CEO. (*Id.*, ¶ 27–29)

On April 14, 1997, Ponsoldt Jr. faxed a letter to Horbach, indicating that he believed the proposed salary for Ponsoldt Sr. was too low.

On June 3, 1997, Regency executed with Ponsoldt Sr. an employment agreement ("1997 Compensation Agreement") which resulted in annual compensation in the amounts of: $548,200 in 1997; $632,555 in 1998; $572,593 in 1999; $781,018 in 2000; and $1,217,558 in 2001.[3] (*Id.*, ¶ 30–31, 34) Plaintiffs label this 1997 Compensation Agreement as "fraudulent."[4] (D.I. 157 at 14) Also on June 3, Regency issued an option to Statesman allowing Statesman to acquire 6.1 million shares of Regency common stock at an exercise price computed in accordance with a formula based upon the market price of the stock at the time the option was exercised, but no less than par value. (*Id.* ¶ 32) Plaintiffs allege that the option was represented as "necessary to protect the NOLS that had been committed to Security Land, and that Statesman would never exercise the option except to prevent a 'hostile takeover' of Regency."[5] (*Id.*, ¶ 32) In addition to the issued options, 466,667 shares of Regency common stock at a value of $233,333 were transferred to Statesman. (D.I. 298, ex. F at 8)

On June 28, 1998, Regency refinanced its long-term debt previously outstanding to Southern Indiana Properties, Inc. ("SIPI"), through a loan agreement with KBC Bank. KBC Bank loaned Regency $9,383,320, of which $6.1 million was used to pay Regency's outstanding obligations to SIPI, and $1.8 million was used to pay accrued compensation and bonus owed to Ponsoldt Sr. The KBC loan was secured by Regency's interest in Secured Land. (*Id.*, ¶ 36) Also in 1998, Ponsoldt Sr. caused

---

**3.** The agreement provided for the following: (1) a salary of $250,000 adjusted annually to the consumer price index; additional salary based on a formula tied to the enhancement of the overall net worth of Regency, payable quarterly based upon unaudited financial statements of Regency; (2) a right to elect to receive some portion of his salary or increased salary in the form of payments to retirement plans or to purchase life insurance; (3) a right to receive at the end of each quarter up to fifty percent (50%) of the additional salary through the issuance of warrants to purchase Regency stock at a price equal to fifty percent (50%) of the average bid for Regency stock during the calendar quarter for which said increased salary is payable; and (4) the right to purchase shares owed under the agreement by giving a promissory note secured only by a pledge of the shares purchased, payable in a balloon payment five years after the date of the note. (D.I.157, ¶ 31)

**4.** The court is unable to discern from the pleadings what, if anything, was fraudulent about the agreement. Plaintiffs do not describe any misrepresentation in the agreement or in the inducement thereof. At worst, the amended complaint describes a case of an exorbitant compensation package, approved by a Board of Directors in violation of their fiduciary duties. Nonetheless, it was approved by the Board and publicly disclosed and apparently remained unchallenged by outside directors or stockholders until the filing of this suit, four years after the fact.

**5.** Regency's 2000 Annual Report, however, tells a different story. (D.I. 298, ex. E at 11) According to that 10–K SEC filing, the options were granted to Statesman to secure the release of Ponsoldt Sr. so that he could serve as President and CEO and in part to recognize that Statesman had forfeited certain conversion rights held under its Series C Preferred shares. The 2000 report also indicated that Statesman had provided more than $2 million in loan guarantees since June 1997. (*Id.*) The 10–K makes no mention of any restriction on the exercise of the options that is contingent upon a hostile take-over. (*Id.*) Assuming arguendo that the options granted to Statesmen were intended to be solely a defensive mechanism, plaintiffs' theory does not explain why it was not expressly conditioned as such.

Regency to issue 187,000 shares of common stock to Ponsoldt Sr. in payment of accrued compensation.

### 4. Glas–Aire Acquisition and Divesture

Glas–Aire Industries Group Limited ("Glas–Aire") is a Canadian corporation involved in the manufacture of auto parts and traded on the NASDAQ small cap market. On April 22, 1999, Regency acquired 513,915 shares of the common stock of Glas–Aire in exchange for $1,213,000 in cash and a promissory note of $650,000 due January 1, 2000, at an interest rate of 7.5% per annum. (D.I.298, ex. F) The promissory note was guaranteed by Ponsoldt Sr. (*Id.*, ex. F at 3) The cash for the transaction was obtained from a Statesman affiliate through the issuance of an unsecured note at an interest rate of 7.5%. (*Id.*) At that time, Regency also purchased 3,000 shares of Glas–Aire on the open market.

On August 2, 1999, Regency acquired an additional 41,600 shares of Glas–Aire common stock on the open market for $116,619, with funding provided by a Statesman affiliate on an unsecured basis. (*Id.*) On August 14, 1999, Regency sold 2,852,375 shares of its own common stock to Glas–Aire in exchange for cash and stock valued at $2,281,900.[6] (*Id.*) On September 22, 1999, Regency closed a common stock exchange agreement with certain Glas–Aire stockholders, exchanging 1,188,000 shares of its stock for 288,000 Glas–Aire common shares held by Glas–Aire stockholders.

On October 1, 2001, Regency, in a cash and stock transaction, divested itself of its shares in Glas–Aire (the "2001 Glas–Aire transaction"). By the terms of the agreement, Regency exchanged its 1,214,105 shares of Glas–Aire common stock, representing fifty percent (50%) of the issued and outstanding shares of Glas–Aire, for $2,500,000 plus 4,040,375 shares of Regency's common stock, or approximately twenty-three percent (23%) of the issued and outstanding shares of Regency.[7]

Plaintiffs allege that Glass–Aire was the only operating subsidiary of Regency generating positive cash flow and that at least $1.3 million of the cash received from Glass–Aire was used to pay off certain promissory notes issued to Ponsoldt Sr. as accrued compensation.

### 5. Statesman Exercises Its Option

On October 15, 2001, Statesman exercised its option in full, and paid the shares par value, which was forty cents ($0.40) a share, for a total of $2.44 million.[8] (D.I. 298, ex. F at 10) In lieu of cash, Statesman, pursuant to its option agreement, issued a five year promissory note secured by both the shares and Statesmen's twenty percent (20%) interest in NRDC.[9] (*Id.*)

---

**6.** Glas–Aire tendered $1,967,960 in cash and 86,000 shares of its common stock. (*Id.*)

**7.** According to Regency's 2001 Annual Report, the Glas–Aire transaction was the subject of a Canadian law suit brought by Glas–Aire's former president, Alex Ding. Ding alleged that the transaction violated banking and securities laws as well as fiduciary duties owed to Glas–Aire stockholders. (D.I. 298, ex. F at 6).

**8.** Presumably, since Statesman paid par value for the shares when it executed its option, the market value of Regency shares was less than forty cents ($0.40). As previously noted, the option required that Statesman pay market value for the shares but no less than par value. (D.I.157, ¶ 32).

**9.** Plaintiffs imply that because no cash was tendered at the time Statesman tendered its option, a fraud was somehow committed. It is unclear to the court, however, how this secured promissory note is fraudulent on its face.

According to plaintiffs, the exercise of this option resulted in a reduction in ownership interest of the Class which they seek to represent, from approximately 89.1% to 61.1%.

### 6. 2001 Annual Stockholders Meeting

On January 16, 2001, an annual meeting of the stockholders was held in Nassau, The Bahamas.[10] There were four issues decided by stockholders; one of these is challenged by plaintiffs. (D.I. 298, ex. F at 6)

At the 2001 meeting, stockholders approved a one-for-ten reverse stock split and a decrease in par value from forty cents to one cent. According to the 2001 Annual Report, stockholders approved the action, with 14,405,745 voting in favor, 525,840 voting against, and 37,064 abstaining. (D.I. 298, ex. F at 7) Plaintiffs allege that this action was "orchestrated" by Ponsoldt Sr. at an "adjourned meeting of the shareholders." (D.I.157, ¶ 41) As of April 8, 2002, there were a total of 1,939,874 outstanding shares of Regency common stock.

Plaintiffs assert that following the split, the market price for Regency's common stock decreased from approximately twenty-nine cents ($0.29) a share to approximately eleven cents ($0.11) a share on a split-adjusted basis. Plaintiffs also contend that Regency failed to effect a proportionate reduction in authorized shares, resulting in the potential for further dilution. Further, plaintiffs allege that the stock's par value should have been raised to $4.00, rather than reduced to one cent.[11]

### C. Notice to Regency Board of Directors

On or about December 4, 2000, plaintiff Graham and former President Horbach "raised questions at a Board of Directors meeting in Denver, Colorado concerning [Ponsoldt Sr.'s] conduct that had prompted a Securities and Exchange Commission investigation." (D.I.157, ¶ 44) Plaintiffs contend that after Regency failed to take action concerning Ponsoldt Sr.'s alleged illegal conduct, Graham and Horbach resigned from the board.[12]

On September 9, 2001, Kelly, the former acting CEO and then director, wrote a letter to Regency's Board of Directors raising several concerns.[13] On October 17,

---

**10.** In the complaint, plaintiffs allege that this meeting occurred on January 16, 2002. (D.I. 157, ¶ 41) The 2001 Annual Report indicates, however, that the meeting was held on January 16, 2001. (D.I. 298, ex. F at 6).

**11.** It is unclear how these acts authorized by a shareholder vote, taken in a light most favorable to plaintiffs, amount to fraud.

**12.** Subsequent to his resignation, Horbach has been involved in litigation related to a loan Horbach allegedly secured while serving as Regency's CFO. Regency brought suit in Florida alleging that the loan was fraudulently arranged by Horbach for his personal use in the name of Regency. Horbach brought suit in Nebraska seeking to enforce the loan, after having purchased the note from the original lender. (D.I. 298, ex. F at 6).

**13.** Kelly stated the following: (1) she had not received a revised copy of the minutes for the December 3–4, 2000 board meeting, although she had voted to approve them; (2) she was concerned regarding the propriety of Baldinger serving on the audit committee, based on SEC audit committee rules, and his new position as CFO; (3) she was concerned about the propriety of Carey serving on the audit committee due to "her relationship" with Statesman; (4) she believed that there was a conflict of interest by the securing of Ponsoldt Sr.'s bonus with Glas–Aire stock; (5) she believed that the Glas–Aire redemption could result in "some sort of dilution in value for the shareholders" and that Ponsoldt Sr. will be "paid first" leaving the corporation without funds for future acquisitions; and (6) Regency's payment of a $25,000 retainer to a

2001, Kelly resigned from the Board citing numerous failures and board improprieties.[14]

### D. Plaintiffs Initiate Litigation

On May 2, 2002, plaintiffs filed their original complaint in the United States District Court for the District of Nebraska. (D.I.1) Plaintiffs sought a preliminary injunction against Ponsoldt Sr. and Statesman to prevent payment of compensation to Ponsoldt Sr., to prevent Statesman from exercising its options, and to obtain a judgment for money damages against Statesman and the Former Regency Directors. On July 22, 2002, plaintiffs filed a motion for a preliminary injunction, which was denied on October 25, 2002. (D.I.39, 132) On September 18, 2002, plaintiffs Gatz and Graham made a $17 million financing agreement offer to Regency to "provide an alternative to the [Royalty] transaction negotiated by [Ponsoldt Sr.]." (D.I.157, ¶ 52)

### D. Royalty and the Recapitalization of Regency

On October 17, 2002, Regency announced that it had completed a recapitalization, which included the redemption of 754,950 shares of Regency common stock owned by Statesman and the distribution of the following cash payments to Statesman: (1) a $1,020,000 redemption payment; (b) a $2,730,000 "fee;" and (c) $250,000 in exchange for a call option agreement granting Regency an option to purchase the twenty percent (20%) of outstanding shares of NRDC owned by Statesman. (D.I.157, ¶ 54) The transaction also transferred to Statesman the office equipment and furniture located at Regency's Florida office, and it amended and restated the terms of Statesman's $2.44 million promissory note, executed in conjunction with Statesman's 2001 exercise of its options.[15]

Royalty loaned Regency $4,750,000 to fund the payments to Statesman. The terms of the loan include a $3,500,000 five percent (5%) convertible promissory note and a $1,250,000 nine percent (9%) promissory note. The convertible note grants Royalty the option to acquire 1,750,000 shares of Regency common stock at $2.00 per share. If fully exercised, plaintiffs allege the convertible note would result in Royalty owning 59.31% of the outstanding shares of Regency.[16] (*Id.*, ¶ 55)

---

law firm for services for Ponsoldt Sr. personally. (D.I.157, ¶ 45).

**14.** Kelly alleged the following in her October 17 letter: (1) "numerous significant activities have occurred by the management . . . which preclude normal fiduciary functioning;" (2) failure, over the prior ten months, to obtain approval of the Board for SEC filings; (3) alleged false statements on SEC filings related to the Glas–Aire acquisition; (4) termination of Alex Ding as CEO of Glas–Aire without Regency board approval; (5) intentional structuring of board meetings to prevent independent board member attendance; (6) multiple failures of Regency board to correct errors and inaccuracies on board minutes, specifically related to stockholder and audit committee issues; (7) and "Management has initiated significant changes which affect the interests of the shareholders without Board knowledge or approval." (D.I.157, ¶ 46).

**15.** Plaintiffs contend that "this promissory note will never be paid by Statesman unless the fraudulent sham sale of the Aggregate is used to inflate the value of the NRDC common stock owned by Statesman or the Series C Preferred held by Statesman is redeemed." (*Id.*, ¶ 54).

**16.** This, assert plaintiffs, is the basis for a direct injury claim under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* 506 A.2d 173 (Del.1985). Unreconciled in plaintiffs' brief, however, is plaintiffs' claim that they were deprived of a control premium, even though they assert that Statesman is a controlling stockholder of Regency.

As part of the recapitalization, the Regency directors each resigned on October 28, 2002, and were replaced by persons designated by Royalty, including defendant Levy, Neil Hasson, Stanley Fleishman, and Errol Glasser. On October 16, 2002, Levy replaced Ponsoldt Sr. as President and CEO, and Hasson replaced Baldinger as CFO. Plaintiffs allege that "Levy is a corporate raider" who intends to monetize Regency's assets. (*Id.*, ¶ 56)

### E. Subsequent Procedural History

On January 7, 2003, plaintiffs filed an amended complaint. (D.I.157) On March 6, 2003, the Former Regency Director defendants moved to dismiss the amended complaint. In April 2003, plaintiffs filed a renewed motion for preliminary injunction and a temporary restraining order. (D.I. 218) On April 21, 2003, following a motion hearing, the Nebraska court denied plaintiffs' request for a TRO. (D.I. 226) On May 9, 2003, the Nebraska court limited discovery to only those issues pertaining to the motion for a preliminary injunction and pending motions to dismiss. (D.I.238)

On June 7, 2003, two weeks prior to the scheduled preliminary injunction hearing, the Nebraska court entered an order transferring the matter to this court on the basis of lack of personal jurisdiction over the parties and improper venue. (D.I.277) Although briefing was complete on the defendants' motions to dismiss and for the plaintiffs' motion for a preliminary injunction, the Nebraska court denied all those motions as moot via transfer but with leave to refile them without prejudice. (D.I.277)

On September 23, 2003, Former Regency Directors filed a motion to dismiss the amended complaint. (D.I.296) On September 26, 2003, Statesman filed a motion to dismiss the amended complaint. (D.I.299) On October 14, 2003, plaintiffs filed a motion for leave to file a supplemental and second amended complaint. (D.I.302) On October 20, 2003, plaintiffs filed for a motion for an order to maintain the status quo and a motion for a preliminary injunction. (D.I.305-1, 305-2) On November 7, 2003, Royalty defendants filed a motion to dismiss. (D.I.321) On November 7, Regency filed a motion to dismiss. (D.I.324)

### III. STANDARD OF REVIEW

Because the parties have referred to matters outside the pleadings, defendants' motions to dismiss shall be treated as motions for summary judgment. *See* Fed. R.Civ.P. 12(b)(6). A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to

the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995).

The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV.  DISCUSSION

### A.  The Amended Complaint

Plaintiffs assert the following causes of action in the amended complaint: (1) a class claim alleging that defendants Ponsoldt Sr. and Statesman engaged in a pattern of conduct in violation of 18 U.S.C. § 1962(b) resulting in the cash-value dilution of plaintiffs' shares; (2) a class claim alleging that defendants engaged in a pattern of conduct in violation of 18 U.S.C. § 1962(c) resulting in a cash-value dilution of plaintiffs' shares; (3) a derivative claim alleging breaches of fiduciary duty against defendants Ponsoldt Jr., Baldinger, Carey and Craffey pertaining to Ponsoldt Sr.'s compensation agreement and the Royalty transaction; (4) a class claim alleging breaches of fiduciary duty against Ponsoldt Sr. and Statesman; (5) a class claim for declaratory judgment that all stock held by Statesman, Ponsoldt Sr., and any affiliated persons or entities, be declared void; (6) a class claim alleging that Royalty defendants knowingly participated in a breach of fiduciary duty; (7) a class claim against defendants alleging that the Royalty transaction constituted a fraudulent conveyance; and (8) a class claim against Royalty defendants alleging a violation of 18 U.S.C. § 1962(d).  (D.I.157)

### B.  Plaintiffs' Claims Under RICO

■ The complaint asserts three federal claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1962. Defendants argue that the complaint is fatally defective for six reasons:[17] (1) the § 1962(b) claim fails to plead the requisite nexus; (2) the § 1962(c) claim violates the victim enterprise rule; (3) plaintiffs have failed to plead proper predicate acts under RICO as the Private Securities Litigation Reform Act bars conduct which is actionable under federal securities law; (4) plaintiffs lack standing to assert claims under RICO because their claims are derivative in nature; (5) the RICO claims fails to adequately plead a pattern of racketeering activity; and (6) plaintiffs' RICO claims do not satisfy Fed.R.Civ.P. 9(b)'s requirements for particularity. Because the court concludes that plaintiffs have failed to allege proper predicate acts under RICO, it is unnecessary for the court to consider the other pleading defects.

In the amended complaint, plaintiffs assert as predicate acts the intentional commission of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.[18]

---

17. The court notes that defendants have, in many cases, adopted by reference each other's arguments for dismissal. As distinguishing between the defendants in this context will not affect the analysis, the court for simplicity purposes declines to do so.

18. With regard to the alleged mail fraud, plaintiffs refer to forty-three (43) separate in-

Defendants contend, inter alia, that plaintiffs' claims are barred by operation of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (1995).

Section 107 of the PSLRA provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c) ("RICO Amendment"). The Third Circuit has held that under § 1964(c) "a plaintiff cannot avoid the RICO Amendment's bar by pleading mail, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." *Bald Eagle Area Sch. Dist. v. Keystone Financial, Inc.*, 189 F.3d 321, 328 (1999). The proper test is whether "the conduct pled as predicate offenses is actionable as securities fraud." *Id.* The PSLRA does not function, however, as a bar to RICO actions predicated upon conduct that occurred prior to its December 1995 adoption. *See Mathews v. Kidder, Peabody & Co., Inc.*, 161 F.3d 156 (3d Cir.1998).

Plaintiffs' allegations focus on six alleged fraudulent transactions: (1) the 1993 Aggregate transaction; (2) the 1996 Ponsoldt Sr. compensation agreement; (3) the 2001 Glas–Aire transaction; (4) Statesman's 2001 obtainment and exercise of its stock options; (5) the approval at the 2001 Annual Stockholders meeting of a reverse stock split and reduction in par value; and (6) the 2002 Royalty transaction resulting in the recapitalization of Regency.

Section 10(b) of the Securities Exchange Act of 1934 states that

[t]o use or employ, in connection with the purchase or sale of any security

registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (2002). The SEC promulgated Rule 10b–5 that states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2003). In the present case, the conduct the plaintiffs allege to be fraudulent would fully fall within the scope of § 10(b) and Rule 10b–5.

As described by plaintiffs, the alleged scheme involved a series of fraudulent transactions designed to loot Regency for the purposes of maximizing Ponsoldt Sr.'s compensation and to the benefit of Statesman, a controlling shareholder, concluding with a recapitalization that improperly transferred control to Royalty. The predicate acts consist of the use of the mails

cidents of the use of the mails, beginning on July 29, 1992 and ending on September 11, 2002. (D.I.157, ex. A) With regard to the

alleged wire fraud, plaintiffs refer to ninety-nine (99) separate incidents of wire fraud. (D.I.157, ex. B).

and wires to conduct a series of transactions, each involving or related to covered securities.[19] Applying the *Bald Eagle* test, the court concludes that the conduct alleged as predicate acts by the plaintiffs would be actionable as securities fraud and, consequently, may not serve as predicate acts for purpose of a civil RICO action.

Plaintiffs contend that this exclusion does not apply, as they have not alleged that they were purchasers or sellers of securities. (D.I. 325 at 16) Plaintiffs' contention is without merit. A plaintiff cannot circumvent the PSLRA's exclusion of securities fraud as a RICO predicate act through artful pleading. *Bald Eagle*, 189 F.3d at 328. Whether plaintiffs were purchasers or sellers of securities would only be relevant to the inquiry of their standing to bring a securities fraud claim, whereas the PSLRA's exclusion of securities fraud as a RICO predicate act applies regardless of whether a particular plaintiff has standing to bring a civil action under § 10b and Rule 10b–5. *See In re Enron Corp. Securities, Derivative & ERISA Litig.,* 284 F.Supp.2d 511, 620 (S.D.Tex.2003) ("The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws."); *In re Ikon Office Solutions Inc. Sec. Litig.,* 86 F.Supp.2d 481, 486 (E.D.Pa.2000). *See also Howard v. America Online Inc.,* 208 F.3d 741 (9th Cir.2000).

Plaintiffs rely upon *In re Ikon* to support their claim that the present case does not sound in securities fraud. (D.I. 325 at 16) That case, however, wholly undercuts plaintiffs' argument. In the *In re Ikon* case, the plaintiff alleged that her previous employer had "systematically engaged in improper accounting, leasing, and billing procedures in order to inflate Ikon stock artificially and to permit certain individuals to receive large bonuses." *In re Ikon,* 86 F.Supp.2d at 483. The fraudulent scheme, as alleged by the *In re Ikon* plaintiff, is nearly on four corners with the conduct alleged in the present case, as it involved the fraudulent manipulation of the corporation's stock price, the purchase of other businesses with that stock, and the receipt of improper compensation by the defendants. As a consequence, the *In re Ikon* court concluded that "the underlying financial improprieties are actionable as securities fraud." *Id.* at 487.

Plaintiffs argue that defendants "have not distinguished between predicate acts alleged for the purpose of showing the pattern of racketeering activity under 18 U.S.C. § 1961(5), and those alleged as liability producing predicate acts for which damages are sought under 18 U.S.C. § 1964(c)." (D.I. 316 at 9) Providing no explanation and citing no authority, the plaintiffs' contention is a distinction without a difference. In the present case, the predicate acts alleged by the plaintiffs consist of the use of mails and wires in "furtherance of this fraudulent scheme." (D.I. 325 at 23) That exact same conduct, the use of mails and wires in furtherance of a fraudulent scheme, is securities fraud when done in connection with the purchase or sale of securities. *See* 17 C.F.R. § 240.10b–5. The PSLRA acts as an absolute bar to RICO claims predicated upon

---

**19.** The initial 1993 Aggregate transaction was, at its core, a sale of securities. The conduct pertaining to Ponsoldt Sr.'s alleged excessive and fraudulent compensation was contingent upon the sale of securities. The 2001 Glas–Aire transaction was a sale and purchase of securities. Statesman's obtainment and exercise of its stock options was a sale and purchase of securities. Finally, the 2002 Royalty transaction involved the sale and purchase of securities.

conduct which could have been actionable as securities fraud.

▮ Plaintiffs also contend that the PSLRA's bar does not apply retroactively to conduct occurring before its December 1995 enactment. (D.I. 325 at 16) While the PSLRA does not bar a RICO action based upon predicate acts arising before December 1995, such conduct is still subject to the four-year statute of limitations applied to civil RICO claims. *See Agency Holding Corp. v. Malley–Duff & Associates Inc.*, 483 U.S. 143, 155, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The Third Circuit has adopted the "injury discovery" rule for determining when a claim accrues under § 1962. *See Forbes v. Eagleson*, 228 F.3d 471, 484 (2000). Under this rule, the court "must determine when the plaintiffs knew or should have known of their injury." *Id.* As plaintiffs filed this complaint on May 2, 2002, if they knew or should have known of their injury prior to May 2, 1998, then the action is barred.[20]

The 1993 Aggregate transaction was the first major transaction engaged in by Regency following its emergence from bankruptcy. Prior to that transaction, the corporation had no income producing activities and a single individual acted as director and executive officer. The transaction resulted in the acquisition of an allegedly substantial asset and the acquisition of several new directors.

Reviewing the facts in the light most favorable to the plaintiffs, stockholders exercising reasonable diligence should have discovered that Aggregate transaction was a sham. *See Forbes*, 228 F.3d at 485. Plaintiffs plead no facts from which the court might conclude that occurrence of this transaction, and the related election of new directors, was concealed from plaintiffs. *See id.* at 486–87. Therefore, the court need not consider whether equitable principles require a tolling of the statute of limitations. As plaintiffs have failed to plead proper predicate acts under RICO, counts 1, 2, and 8 of the amended complaint must be dismissed.[21]

## C. Plaintiffs' Motion to File a Supplemental and Second Amended Complaint

Plaintiffs have moved this court for leave to file a proposed second amended complaint. (D.I 302) Fed.R.Civ.P. 15(a) provides that "leave [to amend] shall be freely given when justice so requires." *See also Gooding v. Warner–Lambert Co.*, 744 F.2d 354, 358 (3d Cir.1984). However, where the "amendment would not withstand a motion to dismiss" the court may deny the motion. *Massarsky v. General Motors Corp.* 706 F.2d 111, 125 (3d. Cir. 1983). Upon review of the proposed second amended complaint, the court concludes that the proposed amendments to would not alter the court's analysis. (D.I. 302, Ex. A) Consequently, the motion for leave to file a second amended complaint is denied.

## D. Subject Matter Jurisdiction

▮ Fed.R.Civ.P. 12(h) requires that "[w]henever it appears by suggestion of

---

20. The court will presume, for these purposes only, that plaintiffs were even stockholders at the time of the 1993 Aggregate transaction, as plaintiffs have not alleged in the amended complaint that they were, in fact, stockholders throughout the relevant period.

21. Count 8 of the amended complaint alleges a claim under § 1962(d), conspiracy to violate RICO. It is axiomatic that in the absence of a valid substantive claim under RICO, a claim of conspiracy cannot lie. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir.1993) ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.").

the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Not only may the lack of subject matter jurisdiction be raised at any time, it cannot be waived and the court is obliged to address the issue on its own motion. *See Moodie v. Fed. Reserve Bank of NY*, 58 F.3d 879, 882 (2d Cir.1995).

In the absence of its RICO claims, plaintiffs' sole basis for jurisdiction in federal court is on complete diversity of the parties. 28 U.S.C. § 1332. Plaintiffs' amended complaint and proposed second amended complaint assert both direct and derivative claims. In the case of a stockholder's suit brought derivatively in the name of the corporation, the Supreme Court has held that the "corporation is ... the real party in interest, the stockholder being at best the nominal plaintiff. The proceeds of the action belong to the corporation and it is bound by the result of the suit." *Ross v. Bernhard,* 396 U.S. 531, 538–39, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970).

In the present case, Regency, a Delaware corporation, is a plaintiff and real party in interest with respect to the derivative claims, and is a citizen of Delaware for purposes of determining diversity of the parties. 28 U.S.C. § 1332(c)(1). Defendants Royalty Holdings LLC and Royalty Management, Inc. are also Delaware entities and, therefore, citizens of Delaware. *Id.* Consequently, the court will dismiss the remainder of the claims for lack of subject matter jurisdiction.

## VI. CONCLUSION

For the reasons discussed above, defendants' motions to dismiss the amended complaint are granted in part, and all other motions are denied. The court, on its own motion, dismisses the remainder of the complaint for lack of subject matter jurisdiction. An appropriate order shall issue consistent with this opinion.

## ORDER

At Wilmington, this 18th day of December 2003, for the reasons stated in the memorandum opinion issued this date;

IT IS ORDERED that:

1. The motion by William R. Ponsoldt, Sr., William R. Ponsoldt, Jr., Marc H. Baldinger, Stephanie Carey, and Martin J. Craffey to dismiss the amended complaint is **granted** with respect to counts 1, 2 and 8. (D.I.296)

2. The motion by Statesman Group, Inc. to dismiss the amended complaint is **granted** with respect to counts 1, 2 and 8. (D.I.299)

3. The motion by plaintiffs for leave to file a supplemental and second amended complaint is **denied**. (D.I.302)

4. The motion by plaintiffs for an order maintaining the status quo is **denied**. (D.I.305–1)

5. The motion by plaintiffs for a preliminary injunction is **denied**. (D.I.305–2)

6. The motion by Royalty Holdings, LLC, Royalty Management Inc., and Laurence Levy to dismiss the amended complaint is **granted** with respect to counts 1, 2, and 8. (D.I.321)

7. The motion by Regency to dismiss the amended complaint is **granted** with respect to counts 1, 2 and 8. (D.I.324)

8. The motion by William R. Ponsoldt, Sr., William R. Ponsoldt, Jr., Marc H. Baldinger, Stephanie Carey and Martin J. Craffey to stay discovery and for a protective order is **denied** as moot. (D.I.342)

9. The court, on its own motion, dismisses the remainder of the amended complaint (D.I.157) for lack of subject matter jurisdiction.

10. The clerk is directed to enter judgment in favor of the defendants and against plaintiffs with respect to counts 1, 2, and 8.