

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-23-2004

# Dongelewicz v. PNC Bank Natl Assoc

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1045

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

## Recommended Citation

"Dongelewicz v. PNC Bank Natl Assoc" (2004). *2004 Decisions.* Paper 467.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/467

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-1045
_____

LEON R. DONGELEWICZ; MARGARET J. DONGELEWICZ,
Husband and Wife; FRANCIS X. BURNS; LAURA BURNS;
LOIS A. BURNS; GEORGE M. DE PERSIA; SHARON M.
DE PERSIA, Husband and Wife; JOHN B. KNOX; BETSY
C. KNOX, Husband and Wife; *ESTATE OF JOHN T. MIELE;
FRANK J. RACHUBINSKI; HELEN A. RACHUBINSKI, Husband
and Wife; SENTA M. SHERIDAN; GER D.J. SMIT; WACLAW
SZCZESNIAK; DANUTA SZCZESNIAK, Husband and Wife, For
Themselves and on Behalf of all Others Similarly Situated,

Appellants

v.

*PNC BANK NATIONAL ASSOCIATION, Successor by Merger
to First Eastern Bank,** BANKSHARES REALTY COMPANY,
Successor to First Eastern Corp.; FRANK M. CEDRONE;
C.B.G. LIMITED, A Pennsylvania Limited Partnership;
ONEIDA WATER COMPANY, A Company Organized Under the
Laws of Pennsylvania; VALLEY UTILITIES COMPANY, INC.,
A Pennsylvania Corporation; MLA MANAGEMENT ASSOC,
A Pennsylvania Corporation; RALPH CONTE; ARLENE REINESS;
THE PROPERTY OWNERS ASSOCIATION OF THE VALLEY
OF LAKES, An Unincorporated Association

*(Amended Per Clerk's Order dated Janaury 17, 2003)

**(Amended Per Court Order dated April 23, 2003)
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania

District Court Judge: The Honorable James F. McClure
(D.C. Civil No. 95-cv-00457)

_____

Argued on January 26, 2004

Before: NYGAARD, FUENTES, and STAPLETON, <u>Circuit Judges</u>.

(Opinion Filed: July 23, 2004)

Roger S. Antao (argued)
Enna Chuang
Antao & Chuang
2337 Lemoine Avenue
Suite 101A
Fort Lee, NJ 07024

*Attorneys for Appellants*

Steven A. Arbittier (argued)
Darryl J. May
Thomas B. Roberts
Michael N. Gordan
Ballard, Spahr, Andrews &
Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

*Attorneys for Appellees
PNC Bank, N.A. and
Bankshares Realty
Company*

_____

OPINION OF THE COURT

_____

<u>FUENTES, Circuit Judge</u>:

This appeal involves a real estate development known as Valley of the Lakes ("VOL") located near the Poconos in Hazleton, Pennsylvania and developed by CBG Limited ("CBG"), a Pennsylvania Limited Partnership. On June 17, 1994, Leon R. Dongelewicz and ten other sets of VOL lot owners ("Dongelewicz") commenced a class action against the owners and managers of VOL as well as First Eastern Bank, N.A., the development's primary source of financing, alleging years of fraud and broken promises.[1] As of the date of this appeal, First Eastern is the only remaining defendant.[2] Dongelewicz appeals a September 30, 1999 decision of the District Court which decertified the class action, granted summary judgment to First Eastern, and denied appellants' motion for leave to supplement the complaint. We agree with the District Court and affirm.

I.    **Background**

The facts, as exhaustively recounted in Dongelewicz's 157-page complaint, are well known to the parties. We only discuss those that are relevant to our discussion of the issues on appeal. In September of 1986, CBG acquired VOL, a 4000 acre tract of land

---

[1] We will refer to First Eastern Bank, N.A. and its parent, First Eastern Corporation, collectively, as "First Eastern." First Eastern was acquired by PNC Bank, N.A. and by an Order dated January 17, 2003, PNC was substituted for First Eastern. However, because the events at issue here occurred primarily before 2003, we will refer to the relevant party as First Eastern.

[2] CBG, Frank Cedrone (a general partner of CBG), Oneida Water Company and Valley Utilities Company, Inc. (two CBG-related corporations that provided water and utilitites to VOL) defaulted, and MLA Management Associates, Inc. ("MLA"), Ralph Conte, Arlene Rainess, and the Property Owners Association of VOL settled with Dongelewicz.

3

partially subdivided for residential and recreational development. From the registration of the lots in 1987 until about 1989, the VOL development did well, selling lots to individual purchasers and beginning to construct amenities. Potential lot purchasers were told that the development would eventually include roads, a central sewer system, an 18-hole golf course and "Lake Algonquin." Dongelewicz claims that CBG never intended to complete the promised amenities.

As CBG's primary source of financing, First Eastern Bank made its initial loans to CBG in 1988: a $5 million revolving development loan and a $2 million receivable line of credit. These amounts were increased and by the end of 1989, the Development Loan was at $11,500,000 and the Receivable Line at $10,000,000. The Development Loan was secured by a first mortgage on the property owned by CBG. The primary collateral for the Receivable Line were CBG's accounts receivable on notes secured by purchase money mortgages, ("Lot Paper") which lot owners in VOL provided to CBG when buying lots. CBG financed up to 90% of the lot price, and First Eastern advanced 90% of the financed amount to CBG. When mortgage payments were made to C&E Credit, the funds would be wired to First Eastern as payment on the receivable line.

Although First Eastern advanced the entire Development Loan to CBG, their inspectors found that the improvements described in the Property Reports filed by CBG with HUD were not completed by the dates specified in those reports. In November 1990, CBG failed to meet obligations under the terms of its loans from First Eastern because mortgagors were no longer making enough payments on CBG's purchase money

4

mortgages for the receivables to constitute adequate payment on the receivable loan. CBG attempted to sell or re-finance the development with no success.

Dongelewicz contends that during this period between November 1990 and CBG's declaration of bankruptcy in 1992, First Eastern undertook a scheme to conceal the insolvency of CBG. VOL was having cash-flow difficulties and First Eastern made cash infusions and loans to CBG to keep the development alive and thereby preserve their collateral. Dongelewicz characterizes these actions as a scheme designed to allow CBG to appear solvent to purchasers, property owners, mortgagors, participant banks, bank regulators and HUD, and to continue to perpetrate its land fraud.

On March 30, 1992, CBG filed for Chapter 11 bankruptcy in the Middle District of Pennsylvania, claiming it was necessary in order to complete the development. CBG became debtor-in-possession, and entered into an agreement with MLA Management Associates to monitor their actions. Dongelewicz contends that, after CGB's declaration of bankruptcy, First Eastern concealed the income stream on the receivables from the Bankruptcy court, in effect siphoning millions of dollars of the bankruptcy estate's receivables. Dongelewicz also alleges that, during this period, First Eastern mailed out mortgage coupon booklets to the mortgagors, naming themselves and not CBG as payee, and hired MLA Management Associates to act as their representative at VOL to closely monitor the collection and expenditure of funds, and to develop a budget for CBG. In response, First Eastern argues that the actions it took, including the cash advances and

5

loans, were done to preserve its collateral and therefore provided for by an order of the bankruptcy court dated October 22, 1992.

In February 1995, CBG was removed as debtor-in-possession and a trustee was appointed. In 1996, a joint venture of Double Diamond Inc. and the Valley of the Lakes Civic Association ("VOLCA") acquired VOL. First Eastern had by this time been acquired by PNC, and PNC released its interests in VOL for less than $1,200,000, resulting in a loss of over $20 million.

On June 17, 1994, Dongelewicz commenced this action in the U.S. District Court for the District of New Jersey against CBG, Frank M. Cedrone, Oneida Water, Valley Utilities, First Eastern, MLA, Ralph Conte, and Arlene Rainess. On First Eastern's motion to dismiss, the District Court dismissed all counts except two, one filed pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 USC §§ 1961-1968, and the other filed under the common law of New Jersey for fraud and deceit. The case was thereafter transferred to the Middle District of Pennsylvania by a March 15, 1995 order. A class and subclasses were certified on June 19, 1996. About two years later, Dongelewicz filed a motion to supplement the Complaint asserting new RICO claims against First Eastern based on the allegation that during CBG's bankruptcy, the bank received mortgage payments due to CBG and fraudulently concealed receipt of those payments from the bankruptcy court.

On September 30, 1999 the District Court decertified the class action, granted summary judgment to First Eastern, and denied appellants' motion for leave to

6

supplement the complaint. The District Court originally certified issues for an interlocutory appeal on February 8, 2000, however this court denied permission to appeal at that time. This court's jurisdiction is pursuant to a Fed.R.Civ.P. 54(b) certification issued by the District Court and 28 U.S.C. § 1291.

## II.    DISCUSSION

### A.    Leave to Amend and Supplement

We first address Dongelewicz's motion to amend the complaint to include allegations that the mortgage payments received by First Eastern from lot owners were fraudulently concealed from the bankruptcy court. (App 2341) The District Court denied Dongelewicz's motion to amend holding that the supplemental RICO claims were barred by the statute of limitations and therefore "amendment would be futile." (App 171) We review this decision for abuse of discretion.

The four-year statute of limitations for RICO claims begins to run when a plaintiff knew or should have known that he has been injured. Mathews v. Kidder, Peabody Co., 260 F.3d 239, 247 (3d Cir. 2001). In the proposed supplement, Dongelewicz alleges that First Eastern violated RICO, injuring the bankruptcy estate and the lot owners by receiving payments on the mortgage notes after CBG had filed for bankruptcy. These allegations do not arise from the same conduct alleged in the Complaint, so the supplement cannot relate back under Fed.R.Civ.P. 15(c)(2) to the date of filing. However, as the District Court found, all of the allegations made in the proposed

7

supplement concern conduct which came to the attention of the lot owners over six years before they moved for leave to supplement in 1998. The supplemental claims were therefore untimely. The lot owners knew that CBG was in bankruptcy as of its filing on March 30, 1992. By April 1992, the lot owners' mortgage checks were made payable to and endorsed for deposit by First Eastern (App 5558-61), and the bankruptcy stay, which they now allege First Eastern was violating by cashing their checks, was issued on March 30, 1992. Because we agree that the supplemental claims were untimely, we affirm the District Court's denial of leave to amend.

**B.    Decertification**

We review a class decertification for abuse of discretion. See Holmes v. Pension Plan of Bethlehem Steel Corp. 213 F.3d 124, 136 (3d Cir. 2000). Abuse of discretion is found "where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." Id. (internal quotation omitted)

The District Court decertified the class, holding that the application of the "injury plus pattern discovery rule," in evaluating the statute of limitations defense, would require individualized inquiries into differing factual circumstances and therefore decertification is appropriate. Under the injury plus pattern rule, the limitations period begins when the plaintiff knew or should have known that the defendant engaged in a pattern of racketeering activity and that the plaintiff was injured by the pattern of racketeering activity." See, e.g., Perlberger v. Perlberger, 1999 WL 79503, *3 (E.D. Pa. Feb. 12,

8

1999). Dongelewicz correctly notes that the injury plus pattern discovery rule is no longer the law in this circuit. Shortly after the District Court's decertification order, in Rotella v. Wood, 528 U.S. at 549 (2000), the Supreme Court abrogated the injury plus pattern rule and replaced it with the "injury discovery" rule of Forbes v. Eagleson, 228 F.3d 471, 484 (3d Cir. 2000), *cert denied*, 533 U.S. 929 (2001). Under the injury discovery rule, a RICO claim accrues when the plaintiff knew or should have known of his injury.

Dongelewicz argues that the injury discovery rule presents none of the complexities that led the District Court to decertify the class under the injury plus pattern rule. However, this argument defies common sense because, as the court explained in Forbes, the new rule "alter[s] the judicial landscape unfavorably to the plaintiffs from the shape in which it existed when this case was before the district court" and requires us to "consider the case under an accrual rule more adverse to plaintiffs than that the district court applied." 228 F.3d at 424. In fact, as First Eastern points out, the new rule may mean that all class members' claims are barred by the statute of limitations. Dongelewicz argues that even if the new rule is "stricter" than the old, it does not require the same individualized inquiry that compelled the District Court to decertify, but there is no reason to believe that the District Court's conclusion regarding the need for individualized inquiry is no longer true under the new rule. Under the injury discovery rule, the court must still determine when each lot purchaser, by the exercise of diligence, should have discovered she was injured. With respect to the fraud claims, the District Court held that

9

March 30, 1992 was the latest date any reasonable person would have discovered her injury. However, setting the precise date for each plaintiff, given the differing circumstances of their purchase and ownership of the lots, still requires an "extremely fact-specific" individualized inquiry. Mathews v. Kidder, 260 F.3d 239, 250 (3d Cir. 2001). The District Court's application of the injury discovery rule to the fraud claim is not an apt analogy here because, as this court explained in Mathews, "the focus of accrual in a RICO action is different from that for a fraud claim where the focus is on the acts of the defendants" which are common to all plaintiffs – "a RICO claim accrues when the plaintiffs should have discovered their injuries." Id, at 251. The District Court was well within its discretion decertifying the class in light of the statute of limitations defense, and that decertification remains valid under the new injury discovery rule.

C.    **Summary Judgment**

1.    **RICO Claim**

To establish a RICO violation under § 1962, plaintiffs must prove (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). To recover under civil RICO, an injury to plaintiff's business or property must have been proximately caused by the § 1962 violation. The "conducted the affairs of an enterprise" elements of § 1962(c) are satisfied by showing that a defendant "participate[d] in the operation of management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170, 183 (1993).

10

In granting summary judgment to First Eastern, the District Court relied primarily on Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644 (3d Cir. 1998). Rolo involved a residential land development scheme in which lot purchasers alleged that the developer, GDC, committed RICO predicate acts by making promises concerning future development they never intended to keep. The lot purchasers also sued secondary defendants, who were not alleged to have participated in the fraudulent sales, but were alleged to have enabled GDC to perpetuate its fraud by continuing to finance the development despite knowledge of the fraud, and by their concealment of it. Plaintiffs also alleged that the financiers, by doing the same sorts of things alleged against First Eastern here, had exercised control over the enterprise. The district court dismissed the complaint, finding that the activity did not constitute operation and management of the enterprise as required by Reves. We affirmed, holding that the allegations against the financiers made out an aiding and abetting claim, which was no longer viable after the Supreme Court's decision in Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994).

Dongelewicz is correct to point out that Rolo does not control here because although those facts are appealingly similar to those we face here, in that case, we did not discuss the District Court's ruling concerning the "operation and management" test. However, in his denial of motions for reconsideration, Judge McClure clarified his invocation of Rolo. He explained that he did not hold that Rolo controlled on the Reves issue, but rather noted that "First Eastern's role was analogous to that played by the

'secondary defendants' in <u>Rolo</u>" and held that "since First Eastern did not participate directly in the affairs of the enterprise and cannot be held civilly liable (under <u>Rolo</u>) as an aider and abettor, it cannot be liable."

In <u>Univ. of Md. v. Peat</u>, 996 F.2d 1534 (3d Cir. 1993), policyholders claimed that Peat's provision of accounting and other financial services to an insurer satisfied the <u>Reves</u> standard. We explained, however, that "[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." <u>Id</u>, at 1539. We have also stated, albeit in the fraud context, that "we are unwilling to hold that merely because a lender requires security and approval of aspects of construction, the lender thereby takes 'control' of the project. To do so would wreak havoc on the lending industry, for any lender who reasonably wished to protect itself would be forced to run the risk of being sued for the unknown fraudulent acts of its borrowers." <u>Bhatla v. U.S. Capital Corp</u>., 990 F.2d 780, 778 (3d Cir. 1993). While it is certainly true that a major creditor of a corporation can have "substantial persuasive power" and some legal authority over management, alone, such power is "not equivalent to having the power to conduct or participate directly or indirectly in the conduct in the affairs of those corporations." <u>Strong & Fisher Ltd. v. Maxima Leather, Inc.</u>, 1993 WL 22705, *1 (S.D.N.Y., July 22, 1993).

We agree with that analysis. First Eastern was merely a lender - it supplied financing for a development that failed, and then took steps to preserve its collateral. Such involvement does not support a finding that it "conducted" the affairs of any

"enterprise" under <u>Reves</u> (be it CBG, VOL, or an association in fact of the various defendants). We therefore affirm the District Court's grant of Summary Judgment as to the § 1962(c) claims.

Although § 1962(c) was the focus of Dongelewicz' original claim, in this appeal his emphasis shifts. Based on the District Court's characterization of First Eastern's actions as "aiding and abetting", Dongelewicz argues that the bank's conduct violates § 1962(a) and § 1962(d).

Section 1962(a) prohibits the investment of income derived from a pattern of racketeering activity, by a "principal" in any racketeering activity that affects interstate or foreign commerce. Dongelewicz correctly notes that "principal" is defined in 18 U.S.C. § 2 as anyone who "aids, abets, counsels, commands, induces or procures" a RICO violation. However, contrary to Dongelewicz' assertions, the District Court did not err "as a matter of law," simply by granting summary judgment as to § 1962(a) while simultaneously noting that the evidence, at best, might be sufficient to establish aiding and abetting. Although First Eastern may have reinvested the income received from the Mortgages into VOL, the lot owners had contractual obligations to pay their mortgages, and such payments do not constitute the proceeds of racketeering activities.

Section 1962(d) of RICO makes it "unlawful to conspire to violate [§§ 1962(a), (b) or (c)]." In <u>Smith v. Berg</u>, 247 F.3d 532 (3d Cir. 2001), we adopted the Supreme Court's analysis in <u>Salinas</u>, which held that § 1962(c) liability is not a prerequisite to § 1962(d) liability. Rather, conspiracy liability under § 1962(d) does not require satisfaction of the

13

Reves test, but is governed by the "general principles of criminal conspiracy law" which requires only that the defendant "share[s] a common purpose" with his co-conspirators and "knowingly agrees to facilitate a scheme, which includes the operation or management of a RICO enterprise." Smith 247 F.3d at 538. As First Eastern argued in its motion for summary judgment, the fact that First Eastern provided financing to CBG in no way gives rise to an inference (i) that First Eastern agreed to commit predicate acts; or (ii) that First Eastern knew that the predicate acts were part of racketeering activity, two necessary elements of a RICO conspiracy.

Dongelewicz additionally argues that the District Court erred as a matter of law because it erroneously imposed the "conducting the affairs of the enterprise" element of § 1962(c) onto § 1962(d). We agree with the District Court, however, that, at best, Dongelewicz "could prove nothing more than that First Eastern facilitated the conduct of CBG's business by providing financing, which it had a contractual obligation to do." This conduct does not violate § 1962(d). Accordingly, we agree with the District Court that "there is no evidence to support a claim that First Eastern directly participated in fraud or extortion…nor does it support a claim of conspiracy." We therefore affirm the District Court's decision on this issue.

### 2. Common Law Fraud Claim

The statute of limitations for fraud in Pennsylvania is two years. A claim accrues when injury is suffered and the statute begins to run when the injured person knows or reasonably should know that he has been injured and that his injury has been caused by

14

another party's conduct.  Ingenito v. AC&S, Inc., 633 A.2d 1172, 1174 (Pa. Super. 1993).

Dongelewicz's primary fraud theory is that First Eastern failed to disclose the precarious

financial condition of CBG to plaintiffs prior to CBG's bankruptcy.  Even assuming

*arguendo* that this claim could support a cause of action for fraud, we agree with the

District Court that Dongelewicz and his fellow lot owners were injured when they

purchased lots in VOL and their claims therefore accrued by 1990.  Therefore, CBG's

filing of bankruptcy on March 30, 1992 was the *latest* point at which the statute of

limitations was triggered for all plaintiffs because it gave any reasonable person cause to

know of the financial status of CBG and of the fact that First Eastern had not disclosed

that financial status to Dongelewicz.

Dongelewicz relies on EBS v. Barclay's, 304 F.3d 302, 306 (3d Cir. 2002), but that

case is not dispositive here.  In EBS, we held that the filing of bankruptcy does not alert a

reasonable plaintiff to the cause of the insolvency and does not trigger the running of the

statute of limitations as to that fraudulent cause.  Here, it is not the cause but the fact of

the insolvency that is in issue – a fact that was allegedly concealed from the plaintiffs by

the actions of First Eastern, but was made plain upon filing of bankruptcy.

Seeking to escape the statute of limitations problem, Dongelewicz suggests that,

after CBG filed for bankruptcy, First Eastern engaged in a "massive bankruptcy fraud."

To the extent that plaintiffs suggest that the statute of limitations with respect to their pre-

bankruptcy failure to disclose claim should be tolled because an alleged fraud upon the

bankruptcy court lulled them into not pursuing their claim, that argument fails.  As the

15

District Court noted, this alleged fraud would "not alter the notice of financial troubles" plaintiffs received when CBG filed for bankruptcy and would not operate to conceal First Eastern's alleged failure to disclose CBG's financial condition to the lot owners before the bankruptcy. See Beauty Time, Inc. v. VU Skin Systems, Inc., 118 F.3d 140, 146 (3d Cir. 1997) (explaining the doctrine of fraudulent concealment).[3]

Dongelewicz has also suggested that, during CBG's bankruptcy, CBG and MLA made various misrepresentations to the lot-owners. Dongelewicz alleges that First Eastern had knowledge of these misrepresentations, but, as the District Court properly concluded, "plaintiffs' attempts to place liability for the actions of MLA [and CBG] on First Eastern based on agency simply are not supported by the record; 'approval' of an action is not agency." (App. 203.) Plaintiffs "had the burden of proving an agency relationship before [MLA's or CBG's] actions could be attributed to and binding on" First Eastern. Bolus v. United Penn Bank, 525 A.2d 1215, 1221 (Pa. Super. Ct. 1987). Simply put, Dongelewicz has not met that burden. No evidence of an agency relationship has been offered [4]

---

[3]We do not examine whether any alleged "fraud upon the bankruptcy court" amounted to a new, actionable fraud claim. As we noted above in addressing the 1998 proposed supplement to plaintiffs' RICO claims, plaintiffs' complaint as filed does not allege such events or allegations with respect to First Eastern having engaged in a "fraud upon the bankruptcy court."

[4] Dongelewicz also briefly argues in his opening brief that mortgage coupon books mailed by C&E Credit to mortgagors amounted to fraud because they requested that payment be made to First Eastern Bank as opposed to CBG, thereby "misrepresenting" First Eastern as the entity mortgage payments were owed to. Additionally, Dongelewicz takes issue with one tax statement mailed to one mortgagor–detailing the amount of interest that mortgagor paid in 1993–because the statement indicated that it was from

Accordingly, we agree with the District Court that First Eastern is entitled to summary judgment on Dongelewicz' claim of common law fraud and we therefore affirm.

## III. CONCLUSION

For the reasons discussed above, we find that the District Court was within its discretion to deny Dongelewicz leave to file a supplement to the complaint and to decertify the class action. Furthermore, we find that the District Court properly granted summary judgment on Dongelewicz' RICO claims and correctly dismissed the fraud claim as untimely. We therefore affirm the judgment of the District Court in its entirety.

---

First Eastern Bank and not CBG. These theories of fraud, however, were not advanced in Dongelewicz's complaint. Of course, "a contention in a brief" "clearly . . . may not" be used to "substitute for an allegation in a complaint," <u>Williams v. New Castle County</u>, 970 F.2d 1260, 1266 n.4 (3d Cir. 1992), especially in the context of a fraud claim, which must be pled with particularity under Fed. R. Civ. P. 9(b).